Richard M. Lorenzen, Bar No. 006787
PERKINS COIE BROWN & BAIN P.A.
2901 North Central Avenue, Suite 2000
Phoenix, Arizona  85012-2788
RLorenzen@perkinscoie.com
Telephone:  602.351.8000
Facsimile:  602.648.7000

Attorneys for U.S. Bank, N.A., as Trustee for
the Registered Holders of Merrill Lynch
Mortgage Trust 2006-C1, Commercial Mortgage
Pass-Through Certificates, Series 2006-C1

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>RCC NORTH, LLC,<br><br>          Debtor. | Chapter 11<br><br>Case No.: 2:10-bk-11078-SSC<br><br>**(1) OBJECTION TO DISCLOSURE STATEMENT RELATING TO PLAN OF REORGANIZATION DATED JULY 14, 2010; AND (2) MOTION FOR EXTENSION OF DEADLINE TO MAKE § 1111(b) ELECTION**<br><br>Hearing Date:  September 2, 2010<br>Hearing Time:  2:30 p.m.<br>Place:          Courtroom 701<br>                    230 N. First Avenue<br>                    Phoenix, AZ 85003 |

U.S. Bank, N.A., as Trustee for the Registered Holders of Merrill Lynch Mortgage Trust 2006-C1, Commercial Mortgage Pass-Through Certificates, Series 2006-C1 ("U.S. Bank"), by and through its undersigned counsel, hereby objects to the *Disclosure Statement Relating to Plan of Reorganization Dated July 14, 2010* (the "Disclosure Statement"), and further requests the court to extend the deadline for US Bank to elect application of §

1111(b)(2), as set forth in more detail below, pursuant to Bankruptcy Rule 3014. This objection and motion are based upon the pleadings on file in this matter and the attached memorandum of points and authorities.

## MEMORANDUM OF POINTS AND AUTHORTIES

RCC North, LLC ("RCC" or "Debtor") is indebted to US Bank in an amount of approximately $71 million.[1] Although the value of US Bank's collateral has not been determined for purposes of plan confirmation, information presently available indicates that the amount of US Bank's deficiency is likely in the range of $30 – 40 million. In any event, there is no doubt that the amount of any other non-insider claims against this bankruptcy estate are microscopic when compared to the amount of US Bank's secured and unsecured claims.

The *Plan of Reorganization dated July 14, 2010* (the "Plan") filed by RCC in this case is quite clearly an attempt by the Debtor to retain all of the collateral for the benefit of the Debtor's principals, while paying US Bank only an amount equal to the present, depressed value of the collateral through an involuntary cram down. The Debtor's principals are attempting to accomplish this result through the creation of what are improperly alleged to be impaired classes of unsecured creditors, and through the improper, artificial impairment of two secured creditors who are lawyers and accountants for the Debtor.

The Disclosure Statement fails in numerous respects to provide adequate information regarding the value of the collateral, the feasibility of the different plan alternatives, and other information required to enable US Bank to meaningfully evaluate the treatment being proposed for US Bank if it makes an election under § 1111(b). The Disclosure Statement should not be approved in its present form, because it does not contain adequate information.

---

[1] *See Declaration of Alex Guggenheim in Support of Motion for Relief From the Automatic Stay* (the "Guggenheim Declaration") [DE 49]. In the Disclosure Statement, RCC disputes the amount of that indebtedness, but provides no explanation or disclosures regarding the basis for its disagreement. The debt includes all amounts due under the relevant Note and Loan Agreement, including without limitation, the additional amounts expressly payable pursuant to Section 2.6(c) of the Loan Agreement, attached as Exhibit "B" to the Guggenheim Declaration.

The Disclosure Statement, however, amply demonstrates Debtor's improper attempts to manufacture an illegitimate class of impaired creditors specifically to thwart US Bank's legitimate right to block confirmation of this Plan by waiving its right to make an election under § 1111(b) and voting against the Plan. Given the significance of such issues, the deadline for US Bank to make such an election should be extended until those legitimate classification and impairment complaints have been resolved, so that US Bank will be able to make an informed and knowing decision as to whether or not to make the 1111(b) election.

I. **THE DISCLOSURE STATEMENT DOES NOT CONTAIN ADEQUATE INFORMATION**

The concept of "adequate information" which is required pursuant to 11 U.S.C. § 1125(a)(1) for the approval of a disclosure statement has been defined by case law. As stated in *In re Unichem Corporation*, 72 B.R. 95 (Bankr. N.D. Ill. 1987):

> The primary purpose of a disclosure statement is to provide all material information which creditors and equity security holders affected by the plan need in order to make an intelligent decision whether to vote for or against the plan. (citations omitted).

*Id*. at 97. (emphasis supplied).

While it is impossible to articulate a universally applicable rule for the information which would be required in every case to enable creditors and interest holders to make an informed decision, certain courts have developed minimal categories of information which must be contained in a disclosure statement. For example, in *In re Metrocraft Publishing Services, Inc.*, 39 B.R. 567 (Bankr. N.D. Ga. 1984), the court held:

> Relevant factors for evaluating the adequacy of a disclosure statement may include (1) the events which lead to the filing of a bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in Chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a Chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the

accountants responsible for such information; (10) the future management of the debtor; (11) the Chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectibility of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a non-bankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with affiliates.

*Id.* at 568. *See also, In re A.C. Williams Co.*, 25 B.R. 173 (Bankr. N.D. Ohio 1982).

### A. Inadequate Evidence of Ability to Perform.

The Disclosure Statement is inadequate because it lacks any information demonstrating that either the Debtor or its principals have obtained the $8 million dollars necessary to move forward even if the Plan were to be confirmed. Likewise, the Disclosure Statement fails to contain any information demonstrating the availability of funds that will be required to maintain the Reserve Accounts at a level of not less than $200,000.[2]

The Disclosure Statement contains no financial projections whatsoever with regard to the situation in which US Bank makes the 1111(b) election. Since the Debtor is proposing to pay US Bank over a period of 25 years in the event that it makes the election, the Disclosure Statement should make adequate disclosures regarding financial projections of revenues and expenses for that period. And yet, there is nothing presented for this alternative.

The projections for the 7 year payout if US Bank does not make the 1111(b) election are superficial at best. There is no information disclosed in the Disclosure Statement regarding the source of the information in those projections, the basis upon which the projections were made, the accounting method utilized, or the name of the accountants responsible for such information. That information should be disclosed.

---

[2] Disclosure Statement, 12:25-27; 15:22-27.

### B. Inadequate Information Regarding Collateral.

The Disclosure Statement does not have adequate information concerning the value of US Bank's collateral. Initially, and totally apart from the inadequacy of the information regarding the value of the real estate, the Disclosure Statement fails to even take into account all of the different types of collateral securing the US Bank indebtedness. For example, the Disclosure Statement fails to disclose or even discuss why the proposed valuation of US Bank's collateral gives no recognition to: (a) the approximately $1,500,000 early termination fee being held by US Bank; (b) the approximately $1,000,000 of the Debtor's accounts receivable,[3] (c) the Debtor's personal property with a book value of approximately $411,000,[4] (d) the contents of all bank accounts in which the Debtor has an interest, or (e) the retainers paid by the Debtor to various professionals prior to the filing of the bankruptcy case. The Disclosure Statement simply contains no discussion or disclosure as to why these items of collateral are not included in determining the value of US Bank's collateral, either for purposes of determining the amount of its secured claim, or determining the present value of payments required to be made to US Bank if the 1111(b) election is made.

Conspicuously lacking from the Disclosure Statement is any meaningful disclosure by the Debtor of information regarding the value of the real estate collateral (the "Office Buildings"). Instead, the Debtor simply notes that US Bank filed a copy of an appraisal (the "Appraisal") with its *Motion for Relief From the Automatic Stay* in this case, and that for purposes of its Plan, the Debtor "does not dispute" the conclusion of the appraiser.[5] The fact that the Debtor may not dispute the amount of that appraisal begs the question of what the Debtor believes the value of the Office Buildings actually is.

As a general matter, the Debtor should be required to disclose what it believes the value of the Office Buildings to be, as well as the basis for its conclusion. For example, in its June 14, 2010 *Response and Objection to Motion For Relief From the Automatic Stay* (the

---

[3] Disclosure Statement, Section V(A)(4).
[4] Disclosure Statement, Section V(A)(5).
[5] Disclosure Statement, 4:10-13.

"Response"), the Debtor asserted that it was "currently in the process of obtaining an updated appraisal of the Property."[6] The Debtor should be required to disclose the results of that updated appraisal, as well as other information potentially relevant to the value of the Office Buildings, including, without limitation, whether: (a) it is aware of or has obtained any other opinions of value; (b) there have been any efforts to market the Office Buildings or investigate the potential market for the Office Buildings; (c) a broker or any third party has been retained to investigate the potential market for the Office Buildings; and (d) the Debtor has received any offers or expressions of interest regarding the potential sale of the Office Buildings.

Similarly, the Debtor should be required to disclose why it believes that it is reasonable to rely on the conclusion of value in the Appraisal, when the projections of revenues from the Office Buildings in the Appraisal are significantly lower than the Debtor's own projections of revenues,[7] and whether the Debtor has obtained or performed a discounted cash flow analysis to determine the value of the Office Buildings based upon the Debtor's own projections of revenues.

### C. Inadequate Information Regarding the Proposed Treatment of US Bank's Claim.

#### 1. If § 1111(b) election is made.

If US Bank makes the § 1111(b) election, then the Plan must, among other things, provide for payments to US Bank having a present value of not less than the total current value of US Bank's collateral. *In re Weinstein*, 227 B.R. 284, 294 (9th Cir. B.A.P. 1998). The Disclosure Statement contains no disclosures regarding what the Debtor contends to be the present value of the proposed stream of payments to US Bank if the election is made. Similarly, there is no disclosure as to what the Debtor believes to be an appropriate discount rate or interest rate that would be used for purposes of this case to calculate such a present value. Since the present value of the proposed stream of payments is a critical element

---

[6] Response, 2:13-14.
[7] Disclosure Statement, Exhibit "A".

necessary for the Debtor to confirm the Plan, proper disclosure as to the Debtor's calculation of the present value and the underlying assumptions, including discount rate, are essential, and should be disclosed so that US Bank will have some understanding as to whether the Plan even facially complies with the requirements for confirmation.[8]

The Disclosure Statement also fails to disclose the terms and conditions of the proposed post-confirmation obligations to US Bank, or the terms and conditions of the lien securing those obligations. Typically, such obligations would be reflected in a restructured promissory note and correspondingly amended deed of trust. However, in the Disclosure Statement, the Debtor merely states that it will have the payment obligations set forth therein, and that such obligations will be secured by a lien. There are no provisions for events of default or remedies (which, as with all other terms other than payment and debt obligations, should be the same as the existing Loan Documents), and it is correspondingly impossible for US Bank to make any kind of determination as to whether the proposed terms and conditions of the post-confirmation loan documents would be fair and equitable.

### 2. If no § 1111(b) election is made.

The Disclosure Statement has similar deficiencies with regard to the proposed treatment of US Bank in the absence of an election under § 1111(b). Although the Disclosure Statement states that US Bank's secured claim would be evidenced by a note,[9] no copy of the promissory note is attached to the Disclosure Statement. In addition, although the Disclosure Statement states that "US Bank will retain its existing lien,"[10] it is not clear whether this means that the existing Deed of Trust will continue to secure the modified loan obligation. In addition, these references to a Note and maintenance of the existing lien further underscore the more extreme deficiencies in the Disclosure Statement regarding the proposed treatment of US Bank in the event of an election, outlined above.

---

[8] *See also, In re Sunflower Racing, Inc.*, 226 B.R. 673, 689 (Dist. Kan. 1998). ("This present value idea means the claim must repay both principal and interest over time if it is to be judged fair and equitable."
[9] Disclosure Statement, 12:2-4.
[10] Disclosure Statement, 12:14-15.

The Disclosure Statement states that unsecured creditors will receive pro rata portions of a $5 million "subordinated debenture."[11] No copy of the proposed subordinated debenture has been provided. Even the most basic information, such as whether it will provide any recourse liability to the reorganized debtor, can be ascertained or considered. Such information is clearly necessary in order for creditors to make an informed decision as to whether to vote for or against the Plan.

### D.  Inadequate Information Regarding Leasing Activities and Conflicts.

The entire Plan is predicated upon an assumption of substantial increases in the leasing of the Office Buildings. For example, under the projections attached as Exhibit "A" to the Disclosure Statement, the net operating income from the Office Buildings is projected to increase from $985,350 in the first year to $2,070,120 in the second year. And yet, there is no information in the Disclosure Statement regarding current leasing activities, prospective tenants, or any information that could be reviewed to determine the reasonableness of these sizable projected increases. Such information should clearly be provided in order to allow creditors to assess the likely success or lack of success of the Debtor's operations and revenues.

In addition, US Bank is informed and believes that a commercial property adjacent to the Office Buildings is owned by an affiliate of the Debtor and managed by the same insider management company (Cavan Management) that manages the Debtor's operations and business affairs. That being the case, there should also be further disclosures regarding these potential conflicts of interest, together with proposed controls, if any, that would regulate or minimize these conflicts of interest. In that regard, US Bank also submits that it would be reasonable and appropriate to require the Debtor to disclose all affiliations between itself, its insiders, and any other entity that owns commercial property that would compete, or potentially compete, with the Debtor for tenants, together with disclosures regarding the current financial status of such entities, the status of leasing at the properties, and whether

---

[11] Disclosure Statement, 19:21-22.

any of the Debtor's affiliates or insiders have personally guaranteed any debts secured by such other property or properties.

   **E. Inadequate Information Regarding the Amount of US Bank's Claim.**

  The Debtor asserts in the Disclosure Statement that it disputes the amount of US Bank's claim; contending that the total amount of the claim is $57,495,000, rather than approximately $71,000,000.[12] However, the Debtor does not disclose any basis for this dispute. Does the Debtor contend that the debt was not accelerated as a result of a default? Does the Debtor contend that Sections 2.6 and 2.7 of the Loan Agreement are unenforceable for some reason? On the other hand, does the Debtor contend that the Loan Documents are enforceable, but that US Bank has miscalculated the amount of the debt? Given that the amount of the US Bank claim is so integral to the entire Plan, and to the Debtor's ability to contend that it has some means to satisfy its obligations under the Plan, such disclosures should be required.

**II. US BANK'S DEADLINE TO MAKE AN ELECTION UNDER 1111(B) SHOULD BE EXTENDED.**

  The shear size of US Bank's deficiency claim means that US Bank would clearly have the ability to protect its interests by not making an 1111(b) election and voting against the Plan, if there was no other legitimate, impaired class of creditors voting in favor of the Plan, since the Debtor would be unable to satisfy the requirement of § 1129(a)(10) of the Code. US Bank believes that it is readily apparent from the contents of the Disclosure Statement that the Debtor's principals have attempted to circumvent US Bank's ability to protect its interests in this matter by attempting improperly to create other classes of purported unsecured creditors, while also improperly attempting to artificially impair two small, friendly secured creditors, for the sole purpose of gerrymandering an impaired class to satisfy § 1129(a)(10). If US Bank is correct in these assertions, then the Plan violates § 1129(a)(1)(2) and/or (3).

---

[12] Disclosure Statement, 8:2-6.

If US Bank is forced to make a decision regarding the 1111(b) election, and makes the election prior to the resolution of these issues, then US Bank's rights could be extremely prejudiced. For example, if US Bank makes the 1111(b) election, it will correspondingly waive any unsecured claim against the estate,[13] and may thereby lose its ability to raise and obtain an adjudication of objections to confirmation that are available only to unsecured creditors (potentially including improper classification of other unsecured creditors). On the other hand, there is no prejudice to the Debtor in deferring the deadline for the election, since the Disclosure Statement and Plan provide what the Debtor contends are terms necessary to satisfy the requirements of § 1129(a) and (b), whether or not US Bank makes the election.

The improper classification of unsecured creditors is occurring with regard to Class 3 and Class 4 under the Plan. Class 3 consists of a claim for tenant improvements held by one of the Debtor's tenants known as Eye Level Holdings. Class 4 consists of unsecured claims by the Debtor's tenants for the return of security deposits. However, according the Article XVI of the Disclosure Statement, all of the tenant leases of the Debtor are to be assumed under the Plan. As held in *In re Boston Post Road Limited Partnership*, 21 F.3d 477, 484 (2nd Cir. 1994):

> The obligations assumed by the debtor under the continued leases constitute post-petition administrative claims. *See* 11 U.S.C. § 503(b)(1)(A). Such administrative claims are defined as priority claims under 11 U.S.C. § 507(a)(1), and must be paid in full in cash pursuant to 11 U.S.C. § 1129(a)(9)(A); their holders are not entitled to vote on a plan of reorganization.[14]

In short, all of the claims in Class 3 and Class 4 are claims of tenants under assumed leases that are required to be paid in full as administrative claims, the creditors holding claims in those classes are not entitled to vote, and neither class may be utilized to satisfy the requirements of § 1129(a)(10). The Plan thus violates § 1129(a)(1)(2) and (3), and/or §

---

[13] *In re Weinstein, supra.*
[14] *See also, In re Cochise College Park, Inc.*, 703 F.2d 1339, 1352 (9th Cir. 1983) ("Until rejection, however, the executory contract continues in effect and the non-bankrupt party to the executory contract is not a creditor with a provable claim against the bankruptcy estate.") Even if the Debtor rejected one or more leases, the resulting claims would simply be unsecured claims in Class 5.

1122.

The Plan also seeks improperly to create classes of impaired secured creditors that could satisfy the requirements of § 1129(a)(10), through the artificial impairment of the claims of the Debtor's professionals; the law firm of Fennemore Craig (Class 2-C) and the accounting firm of Larson Allen (Class 2-D). According to the Disclosure Statement, Fennemore Craig has a claim of $26,439 secured by a cash retainer in the amount of $30,000, while Larson Allen has a claim of $3,941.56 secured by a cash retainer in the amount of $25,000.[15] The Plan proposes to "impair" Fennemore Craig by paying Fennemore Craig the full amount of its claim plus interest at 5.95%, on the Effective Date, even though the retention agreement does not provide for the payment of interest. As for the $3,941.56 claim of Larson Allen, the Plan proposes to "impair" the claim by paying the full amount of the claim from the $25,000 retainer held by Larson Allen to secure its claims, plus interest at 5.95% per year rather than the 1.5% per month called for under the retention agreement between Larson Allen and the Debtor.[16] Assuming 6 months of interest, what this means for Larson Allen is that it would receive under the Plan $117.26 in interest, rather than the $354.74 it is allegedly entitled to, for a difference of $237.48, while Fennemore Craig will receive a bonus payment of approximately $786.56.[17] Thus, by paying Fennemore Craig $786.56 to which it might not otherwise be entitled, and reducing Larson Allen's interest by $237.48, the Debtor contends that it would thereby acquire the right to involuntarily cram down US Bank's deficiency claim of approximately $40,000,000. The inequity of such a result is undeniable.

Many courts have prohibited this type of artificial impairment by interpreting "impairment" to exclude such attempts to "artificially" impair a class.[18] The Ninth Circuit,

---

[15] Disclosure Statement, 8:7-12.
[16] Disclosure Statement, 17:12-15.
[17] The Debtor should also be required to disclose copies of the underlying retention agreements, and to disclose whether Fennemore Craig and Larson Allen have agreed in advance to theses terms, since such an agreement would mean that the Plan does not even arguably alter those parties' rights.
[18] *See, for example, In re Combustion Engineering, Inc.*, 391 F.3d 190, 243 (3rd Cir. 2005):

however, has approached the issue from a different perspective; holding that the concept of "impairment" is very broad, and that the focus of the inquiry should not be on the definition of "impairment", but rather on the fact that a plan is not filed in good faith, and hence does not satisfy the requirements of § 1129(a)(3), if the plan proponent manufactured the impairment "solely to create an impaired class to vote in favor of the Plan, and thus 'cram down' the other impaired classes."[19] In *In re Hotel Associates of Tucson*, 165 B.R. 470, 475-76 (9th Cir. B.A.P. 1994), the court held: "On remand the court should recognize that the act of impairment in an attempt to gerrymander a voting class of creditors is indicative of bad faith." Other courts have similarly recognized that this type of gerrymandering of impairment by a plan proponent to manufacture an impaired class solely for the purpose of satisfying § 1129(a)(10), will not be permitted, whether viewed as "artificial" impairment, or as lacking in good faith.[20]

Under the facts disclosed in the Disclosure Statement, the only conceivable conclusion that may be reached is that the proposed treatment of Fennemore Craig and Larson Allen under the Plan renders the Plan unconfirmable because it was not filed in good faith. The "impairment" of these creditors was manufactured solely and exclusively by the Debtor's principals to create an impaired class for voting purposes, in order to facially satisfy the requirements of § 1129(a)(10), and attempt to involuntarily cram down US Bank's deficiency claim of approximately $40,000,000. There can be no doubt about it. The cash is not only available to pay these creditors in accordance with the terms of their agreements, but

---

> "Artificial" impairment occurs when a plan imposes an insignificant or deminimus impairment on a class of claims to qualify those claims as impaired under § 1124. The chief concern with such conduct is that it potentially allows a debtor to manipulate the Chapter 11 confirmation process by engineering literal compliance with the Code while avoiding opposition to reorganization by truly impaired creditors.

[19] *In re L&J Anaheim Associates*, 995 F.2d 940, 943 (9th Cir. 1993), quoting *In re Club Associates*, 107 B.R. 385, 401 (Bankr. N.D. Ga. 1989) ("An alteration which is clearly intended only to create an impaired class to vote in favor of a plan so that a debtor can effectuate a cram down . . . will not be allowed.").

[20] Citing *In re Woolley's Parkway Center, Inc.,* 174 B.R. 996, 103 (N.Fla. 1992); *In re Meadow Glen, Ltd.*, 87 B.R. 421, 427 (W.Tex. 1988); *In re Windsor on the River Ass., Ltd.*, 7 F.3d 127, 131 (8th Cir. 1993).

the cash is actually being held by those creditors as security for the claims. There is no legitimate reason why the Debtor could not provide for payment of those claims without alteration, nor any reason why the secured creditors could not demand and receive such treatment. Moreover, the extent of the impairment is laughable. Fennemore Craig is actually being impaired by receiving interest to which it would not otherwise be entitled, while Larson Allen is arguably relinquishing only $237.48 to accommodate a client that will presumably need further accounting work in the future.[21]

If, as US Bank contends, based upon the facts of this case and applicable law, there are no legitimate impaired classes of creditors, other than Class 2-A and Class 5, that could satisfy the requirements of § 1129(a)(10), then US Bank would not make the § 1111(b) election, would vote against confirmation of the Plan, and confirmation of the Plan would necessarily be denied. To require US Bank to make such an election prior to a resolution of these issues could cause material prejudice to US Bank, since it would be required to make a decision regarding the potential relinquishment of legal rights without a prior determination as to the existence of such rights, whereas there would be no prejudice to the Debtor or any other creditor or party in granting US Bank's request. Moreover, US Bank's position on these issues appears to be so clearly correct that the disposition of these issues on a preliminary basis would also streamline the process and conserve judicial resources.

WHEREFORE, US Bank respectfully requests the Court to enter an order denying approval of the Disclosure Statement in it present form, together with an order extending the deadline for US Bank to make an election under § 1111(b) until a date following a final determination of the classification, impairment, and good faith issues set forth above, whether prior to or in connection with a confirmation hearing, together with such other and

---

[21] Finally, the Debtor may be attempting to create one last impaired class in the form of an alleged secured property tax claim in favor of Maricopa County (Class 2-B). This may simply be illusory, since US Bank is informed and believes that there no unpaid property taxes, both because US Bank has been required to advance money to pay those property taxes based upon the Debtor's failure to make the payments, and because the Debtor's Schedule D (Creditors Secured Claims) does not list any such secured property tax claim.

further relief as the Court may deem just and proper.

Dated: August 26, 2010. **PERKINS COIE BROWN & BAIN PA**

By: */s/ Richard M. Lorenzen (006787)*
Richard M. Lorenzen
2901 North Central Ave., Suite 2000
Phoenix, Arizona 85012

Attorneys for U.S. Bank, N.A., as Trustee for the Registered Holders of Merrill Lynch Mortgage Trust 2006-C1, Commercial Mortgage Pass-Through Certificates, Series 2006-C1

ORIGINAL electronically filed and
COPY served via E-mail and First Class Mail
on August 26, 2010, to:

**UNITED STATES TRUSTEE**
230 N. First Avenue, Suite 204
Phoenix, AZ 85003

Philip R. Rudd
**POLSINELLI SHUGHART PC**
3636 N. Central Avenue, Suite 1200
Phoenix, AZ 85012
prudd@polsinelli.com
Counsel for Debtor

/s/ *Kathryn Hardy*
60642-0165/LEGAL19025448.1