John J. Hebert (#010633)
Mark W. Roth (#010708)
Philip R. Rudd (#014026)
**POLSINELLI SHUGHART PC**
CityScape Plaza
One East Washington, Suite 1200
Phoenix, AZ 85004
Telephone: (602) 650-2000
Facsimile: (602) 264-7033
E-Mail: jhebert@polsinelli.com
E-Mail: mroth@polsinelli.com
E-Mail: prudd@polsinelli.com

*Attorneys for the Debtor*

## IN THE UNITED STATES BANKRUPTCY COURT

## THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>RCC NORTH, LLC<br>    Debtor. | Chapter 11 Proceedings<br><br>Case No. 2:10-bk-11078-SSC<br><br>**AMENDED DISCLOSURE STATEMENT RELATING TO AMENDED PLAN OF REORGANIZATION** |

### I.    INTRODUCTION

Debtor RCC North, L.L.C., debtor and debtor-in-possession in the above captioned bankruptcy case ("RCC North" or "Debtor"), hereby submits to the Court and creditors of the Debtor's estate the following "Amended Disclosure Statement Relating to Plan of Reorganization" (the "Disclosure Statement"). This Disclosure Statement is submitted pursuant to 11 U.S.C. § 1125.

11 U.S.C. § 1125(b) prohibits the solicitation of acceptances or rejections of a Plan of Reorganization unless such Plan is accompanied by a copy of the Disclosure Statement which has been approved by the Bankruptcy Court.

The purpose of this Disclosure Statement is to provide creditors and interested parties in this bankruptcy proceeding with such information as may reasonably be deemed sufficient to allow creditors and interested parties to make an informed decision regarding the Debtor's "Amended

1

2707020.2

Plan of Reorganization Dated" (the "Plan").

Unless otherwise noted, those portions of the Plan and this Disclosure Statement providing factual information concerning the Debtor, its assets and liabilities, have been prepared from information submitted by the Debtor and its retained professionals.

This Disclosure Statement contains information that may influence your decision to accept or reject the Debtor's proposed Plan. Please read this document with care.

The financial information contained in this Disclosure Statement has not been subjected to an audit by an independent certified public accountant. For that reason, the Debtor is not able to warrant or represent that the information contained in this Disclosure Statement is without any inaccuracy. To the extent practicable, the information has been prepared from the Debtor's financial books and records and great effort has been made to ensure that all such information is fairly represented.

This Disclosure Statement and the Plan will classify all creditors into Classes. The treatment of each Class of creditors will be set forth in this Disclosure Statement and in the Plan. You should carefully examine the treatment of the Class to which your Claim will be assigned.

This Disclosure Statement requires approval by the Bankruptcy Court after notice and a hearing pursuant to 11 U.S.C. §1125(b). Once approved, the Disclosure Statement will be distributed with the Debtor's proposed Plan for voting. Approval of the Disclosure Statement by the Bankruptcy Court does not constitute either certification or approval of the Debtor's Plan by the Bankruptcy Court or that the Disclosure Statement is without any inaccuracy.

The Bankruptcy Court will confirm the Plan if the requirements of §1129 of the Bankruptcy Code are satisfied. The Bankruptcy Court must determine whether the Plan has been accepted by each impaired Class entitled to vote on the Plan. Impaired Classes entitled to vote on the Plan are those Classes of claims whose legal, equitable, or contractual rights are altered, as defined under §1124 of the Bankruptcy Code. An impaired Class of claims is deemed to have accepted the Plan if at least two-thirds (2/3) in amount of those claims who vote and more than one-half (1/2) in number of those claims who vote have accepted the Plan. An impaired Class of interests is deemed to have

accepted the Plan if the Plan has been accepted by at least two-thirds (2/3) in amount of the allowed interests who vote on the Plan.

Even if each Class of creditors does not accept the Plan, the Plan can be confirmed under §1129(b) of the Bankruptcy Code, so long as one impaired Class of creditors accepts the Plan. This is referred to as the "cram down" provision of the Bankruptcy Code. The failure of each Class to accept the Plan could very well result in a conversion of this case to Chapter 7 or dismissal of the Chapter 11.

Only the votes of those creditors or interested parties whose ballots are timely received will be counted in determining whether a Class has accepted the Plan.

## II.   DEFINITIONS

The definitions set forth in Article I of the Plan apply in this Disclosure Statement except to the extent other definitions are set forth in this Disclosure Statement.

## III.   THE DEBTOR, BACKGROUND, AND EVENTS PRECIPITATING THE CHAPTER 11

### A.   Background

The Debtor is a Delaware limited liability company that was formed in February 2006. The Debtor is authorized to do business in Arizona. The Debtor's sole member is Raintree Corporate Center Holdings, LLC ("RCCH"). The Debtor's managers are RCCH, Jennifer A. Schwartz and Victor A. Duva. Cavan Management Services, LLC ("CMS") is RCCH's sole manager.

The Debtor owns and operates two Class "A" office buildings and the related corporate campuses known as Phase I and Phase II of the Raintree Corporate Center located north of the northeast corner of Loop 101 (Pima Freeway) and Raintree Drive, at 15333 North Pima Road and 15111 North Pima Road, respectively, in Scottsdale, Arizona (the "Property"). Each three-story building is approximately 150,000 square feet and were built in 2002 through 2004. The Property is managed by CMS, a well-respected, established manager of commercial real estate throughout the Valley.

Phase I of the Property is currently occupied by 28 tenants in approximately 93,087 square feet of the building. Thus, Phase I of the Property is approximately 62.44% occupied. Phase II of

the Property is currently occupied by 4 tenants in approximately 59,297 square feet of the building. Thus, Phase II of the Property is approximately 40% occupied.[1]

US Bank, N.A., as Trustee for the Registered Holders of Merrill Lynch Mortgage Trust 2006-C1, Commercial Mortgage Pass-Through Certificates, Series 2006-C1 ("US Bank") has asserted a claim against the Debtor, allegedly secured by the Property, in the principal amount of approximately $57.5 million. US Bank has asserted in certain pleadings filed in this case that the amount of its claim as of the Petition Date is approximately $71,000,000. The Debtor disputes that such an amount is owed to US Bank, particularly in light of the $1.5 million delivered to US Bank as discussed in footnote 1, above, and the additional approximately $1.1 million paid by the Debtor to US Bank immediately prior to the Petition Date.

US Bank has obtained an appraisal of the Property indicating that the value of the Property is approximately $27,100,000, as of January 28, 2010, and that the value of the Property, as stabilized by July 28, 2013, will be $32,300,000. The Debtor does not dispute that the current value of the Property is $27,100,000.

Prior to the Debtor's bankruptcy filing, US Bank noticed a non-judicial foreclosure sale of the Property for April 16, 2010. The Debtor filed its voluntary bankruptcy petition in order to stay the foreclosure of the Property.

**B.      Operations**

The Debtor has operated, and intends to continue operating, the Property as a Class "A" office building. The Debtor continues to receive income from tenants to pay for the ordinary and necessary operating expenses of the Property, as well as any necessary repairs, from such income. In fact, the Debtor and US Bank have entered into a stipulation for the Debtor's use of US Bank's asserted cash collateral pursuant to a budget, a copy of which is attached to the stipulation between

---

[1] Notably, Phase II of the Property was previously fully occupied by Pulte Homes. However, in the Fall of 2009, Pulte Homes vacated the Property by exercising an early termination right in its lease and paying an early termination fee of approximately $2.1 million to the Debtor. The Debtor previously delivered a portion of these fees to US Bank. In fact, the Debtor is informed and believes that a substantial portion of these funds—approximately $1.5 million—is currently held by US Bank or its servicer(s) in a reserve account, and the Debtor may seek authority to use such funds for future tenant improvements and/or leasing commissions.

the Debtor and US Bank (the "Budget").  The Budget reflects the current anticipated revenues and expenses relating to the Property.  The Debtor continues to market and lease vacant space in the Property and to renew existing leases when appropriate.

In order to provide for efficient and productive operations, and to keep the Debtor's business competitive, the Debtor intends to retain the same management team and structure that existed pre-petition.  The issues confronted by the Debtor that led to the bankruptcy filing were the product of market changes and the loss of Pulte Homes as a tenant in Phase II of the Property, not the Debtor's management or its structure.  Thus, a change in management structure is not in the best interests of the Debtor or its creditors because the existing structure is appropriate to meet the needs of the Debtor.

By maintaining its current management and operational structure, the Debtor will avoid the transactional costs associated with significant and unnecessary change.  In addition, the institutional knowledge of the management team will be preserved.

Attached hereto as Exhibit "A" are the Debtor's projections of cash flow reflecting the Debtor's sources and uses of cash (including (a) the Debtor's anticipated revenues, and the infusion of cash from the New Value contribution necessary to fund the Reserve Account and to fund the Capital Reserves, as discussed below, and (b) the Debtor's anticipated operating, tenant improvement, leasing commission and capital costs and expenses) for the seven year period following confirmation of the Plan.

### C.    Preferences and Fraudulent Conveyances

To the extent that a preference or fraudulent conveyance occurred before the bankruptcy filing, such transfer may be recoverable by the bankruptcy estate for the benefit of the estate under §§ 544, 547, or 548 of the Bankruptcy Code.  To date, no complaints have been filed under any of these theories, and the Debtor is not currently aware of any causes of action for the recovery of preferences or fraudulent conveyances.  To the extent any such claims exist, they will be analyzed for their potential value to the estate.  These potential claims are specifically preserved for the benefit of the bankruptcy estate.  Any recovery that is obtained will be obtained for the benefit of

the estate.

**IV.     SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE**

**A.     Administrative Proceedings**

The Debtor filed its Petition for Relief under Chapter 11 on April 15, 2010, and a first meeting of creditors was held on May 18, 2010.

**B.     Retention of Professionals**

The Debtor retained Polsinelli Shughart, P.C. ("PS") to act as its original bankruptcy counsel.  The Court signed an Order approving the retention of PS on May 23, 2010.

The Debtor retained Highland Financial Consulting, LLC ("CRO") to act as its Chief Restructuring Officer.  The Court signed an Order approving the retention of the CRO on June 23, 2010.

**C.     Appointment of Unsecured Creditors Committee**

The United States Trustee's Office filed a statement stating that, despite its efforts to contact unsecured creditors, it was unable to appoint a Committee of Unsecured Creditors.

**D.     Motion and Stipulation and Use Cash Collateral**

The Debtor filed a motion to use the revenues generated by the Property, which US Bank asserts constitute its cash collateral, on April 27, 2010.  Although US Bank initially filed an objection to the use of its asserted cash collateral, the Debtor and US Bank resolved US Bank's objections and entered into, and filed on May 7, 2010, a stipulation for the Debtor's use of the asserted cash collateral, through July 31, 2010.  The Debtor anticipates that it and US Bank will enter into a further stipulation regarding the Debtor's use of asserted cash collateral for at least an additional 90 days prior to the expiration of the existing stipulation.

**E.     Operating Reports**

The Debtor's monthly operating reports are current and copies can be obtained from the Court's electronic docket

**F.     Stay Relief Motion**

On May 28, 2010, US Bank filed a motion seeking to terminate the automatic stay to allow

2707020.2

it to foreclose on the Property. The Debtor has objected to the motion for stay relief. On July 7, 2010, the Court held a preliminary hearing on the motion for stay relief and continued such preliminary hearing to July 20, 2010. At the July 20th hearing, the Court ordered that the stay relief motion process will track the plan confirmation process.

### G. Plan of Reorganization

On July 14, 2010, the Debtor filed its initial Plan of Reorganization and initial Disclosure Statement. On September 2, 2010, the Court held a hearing regarding approval of the initial Disclosure Statement and required the Debtor to make certain amendments relating to the treatment of US Bank's claim in the event that US Bank makes the § 1111(b)(2) election. This amended Disclosure Statement and the amended Plan filed herewith, comply with the Court's direction.

The Court also required US Bank to make its § 1111(b)(2) election no later than October 11, 2010. US Bank did not make the election by such date.

## V. DESCRIPTION OF ASSETS AND LIABILITIES OF THE DEBTORS

### A. Assets

The values ascribed to the Debtor's assets below are based on the Debtor's best estimate and other factors such as the purchase price, comparable sales, tax assessments, and appraisals.

**1.    Real Property** –$27.1 million.

**2.    Bank Accounts** – Approximately $93,000 as of the Petition Date. The Debtor has accumulated, and continues to accumulate, net cash from operations of the Property since the Petition Date. The current amount of cash held by the Debtor is reflected in the most recent Monthly Operating Report filed by the Debtor.

**3.    Other Accounts and Deposits** – US Bank holds approximately $1,500,000 in cash that the Debtor delivered to US Bank from the early termination fee paid by Pulte Homes when it vacated the Property. The Debtor also has an interest in certain cash retainers held by professionals that provided services to the Debtor pre-petition. US Bank asserts that these funds constitute part of its collateral. The Debtor disputes such assertion and asserts that these funds should either be returned to the Debtor or applied to US Bank's claim.

2707020.2

**4.** **Accounts Receivable** – The Debtor owns certain accounts receivable from tenants for unpaid rent in the amount of approximately $114,203, and a receivable from a related entity, Cavan Investment Capital ("CIC"), in the amount of approximately $836,964. US Bank asserts that these accounts receivable constitute part of its collateral. The Debtor does not dispute that the unpaid rent receivables are part of US Bank's collateral. The Debtor asserts that the CIC receivable is uncollectible and valueless.

**5.** **Personal Property** – The Debtor owns certain personal property, consisting primarily of office equipment, model unit furniture, fixtures and computer software with an estimated book value of approximately $411,372. US Bank asserts that this personal property constitutes part of its collateral. The Debtor asserts that the fair market value of the personal property is, in context, negligible but will be determined by the Court as part of the confirmation hearing.

**B.** **Liabilities**

The following is an overview of the Debtor's known liabilities.

**1.** **Priority Claims**

The Debtor is not aware of the existence of any pre-petition priority claims.

**2.** **Secured Claims**

a. The Debtor's schedules list US Bank as a secured creditor with a first position lien on the Property in the amount of approximately $57,495,000. In its motion for stay relief, US Bank asserts that the amount owing on its secured claim is approximately $71,000,000 as of the Petition Date. The Debtor disputes this assertion.

b. The Debtor's schedules list the law firm of Fennemore Craig as a secured creditor with a claim of approximately $26,439 secured by a cash retainer held by Fennemore Craig in the amount of $30,000.

c. The Debtor's schedules list the accounting firm of Larson Allen as a secured creditor with a claim of approximately $3,941.56 secured by a cash retainer

held by Larson Allen in the amount of $25,000.

### 3. Unsecured Claims

According to the Debtor's Schedules of Assets and Liabilities, the total amount of unsecured claims, not including any deficiency claims of secured creditors, is $484,970.31. This amount includes tenant security deposits in the amount of approximately $212,592.86, claims owing to CMS in the total amount of $75,000, and a claim for reimbursement of tenant improvement costs, held by Cylon (dba Eye Level Holdings) in the amount of approximately $130,346.

### C. Administrative Expenses

The Debtor's administrative expenses consist of the fees and costs of attorneys and other professionals necessary to the Debtor's operations, bankruptcy case, and plan of reorganization. The fees and costs of these professionals will not be precisely known until the Bankruptcy Case is completed. However, as set forth below, the Debtor's professionals anticipate that either (a) the retainers they presently have will be sufficient to cover the services they have rendered, and will render, in the Bankruptcy Case, or (b) for those professionals that do not have retainers and will be paid by some other manner, their projected anticipated fees and costs for their services will be commensurate with their historical fees and costs incurred by the Debtor.

The Debtor's bankruptcy counsel is PS. PS is currently in possession of a retainer in the amount of $100,000. PS anticipates its fees will be less than the amount of the retainer. However, to the extent that PS's fees and costs exceed the amount of the retainer, PS's fees and costs will constitute administrative claims against the Debtor's Estate.

## VI. PLAN SUMMARY

The following statements concerning the Plan are merely a summary of the Plan and are not complete. The statements are qualified entirely by express reference to the Plan. Creditors are urged to consult with counsel or each other in order to understand the Plan fully. The Plan is complete, inasmuch as it proposes a legally binding agreement by the debtor, and an intelligent judgment cannot be made without reading it in full. With the exception of the Classes 1-A through

1-C (the "Priority Claims"), all the creditors of the Debtor are impaired under the terms of the Plan. The Secured Creditors are impaired because they will be subjected to different treatment than they had originally contracted for with the Debtor. The Unsecured Creditors will be impaired because they will be subject to different treatment than they originally contracted for. Thus, the Debtor will have numerous classes with the right to vote on its Plan of reorganization, as set forth herein.

### A.    CLASSIFICATION OF CLAIMS AND INTERESTS.

#### 1.    Class 1: Priority Claims

a.    Class 1-A consists of Allowed Priority Claims under 11 U.S.C. § 503 and § 507(a)(2) (Administrative Claims).

b.    Class 1-B consists of Allowed Priority Claims under 11 U.S.C. § 507(a)(3) (Wage Claims).

.Class 1-C consists of Allowed Priority Claims under 11 U.S.C. §507(a)(8) (Tax Claims).

#### 2.    Class 2: Secured Claims

a.    Class 2-A consists of the Allowed Secured Claim of US Bank.

b.    Class 2-B consists of the Allowed Secured Claim of Maricopa County for real property taxes.

c.    Class 2-C consists of the Allowed Secured Claim of Fennemore Craig.

d.    Class 2-D consists of the Allowed Secured Claim of Larson Allen.

#### 3.    Class 3: Allowed Claim of Eye Level Holdings

Class 3 consists of the Allowed Claim of Eye Level Holdings relating to the Debtor's obligation to reimburse Eye Level Holdings for tenant improvements made to Eye Level Holdings' leased premises.

#### 4.    Class 4: Tenant Security Deposits

Class 4 consists of Allowed Claims by tenants for the return of tenant security deposits held by the Debtor.

#### 5.    Class 5: Unsecured Claims

Class 5 consists of the Allowed Unsecured Claims of Creditors not otherwise

10

treated in the Plan.

**6.  Class 6:  Interest Holders**

Class 6 consists of all Allowed Interests of Interest Holders.

**B.  IMPAIRMENT OF CLASSES.**

Classes 1-A, 1-B, and 1-C are unimpaired under the Plan.  All other Classes are Impaired, as that term is defined in 11 U.S.C. § 1124.

**C.  TREATMENT OF CLASSES.**

**1.  <u>Class 1:  Priority Claims</u>**

**a.  <u>Class 1-A: Administrative Claims</u>**

This Class consists of Allowed Priority Claims under 11 U.S.C. §§ 503 and 507(a)(2) – administrative priority claims.  Unless Claimants holding Claims in this Class agree to an alternative form of treatment, the Allowed Claims of Class 1-A shall be paid in full, in cash, on or before the Effective Date or as the same are Allowed and ordered paid by the Court.  Any Class 1-A Claim not allowed as of the Effective Date shall be paid as soon thereafter as it is allowed by the Court according to the terms of this Class.  This Class is not impaired.

**b.  <u>Class 1-B:  Wage Claims</u>**

This Class consists of Allowed Priority Claims under 11 U.S.C. § 507(a)(4) – wage claims. As provided in 11 U.S.C. § 1129(a)(9)(B), unless Claimants holding Claims in this Class agree to an alternative form of treatment, the Allowed Priority Claims of Class 1-B shall be paid in full, in cash, on or before the Effective Date. The Debtor does not believe that any claims exist under this Class. Any Class 1-B Claim not allowed as of the Effective Date shall be paid as soon thereafter as they are allowed by the Court according to the terms of this Class.  This Class is not impaired.

**c.  <u>Class 1-C:  Tax Claims</u>**

This Class consists of Allowed Priority Claims under 11 U.S.C. § 507(a)(8) – tax Claims which are not otherwise treated as secured claims herein.  As provided in 11 U.S.C. § 1129(a)(9)(C), unless Claimants holding Claims in this Class agree to an alternative form of treatment, the Allowed Priority Claims of Class 1-C shall be paid in full, in cash, on or before the Effective Date, or, at the Debtor's option, such Allowed Claims shall be paid, on account of such

11

Allowed Claim, deferred cash payments, over a period not exceeding six years after the date of assessment of such Claim, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim.  Any Class 1-C Claims not allowed as of the Effective Date shall be paid as soon thereafter as they are allowed by the Court according to the terms of this Class.  This Class is not impaired.

## 2.  Class 2:  Secured Claims

### a.  Class 2-A – Allowed Secured Claims of US Bank

This Class consists of the Allowed Secured Claim of US Bank.  This Class is impaired.  US Bank asserts that it has the right to make an election under § 1111(b) of the Bankruptcy Code.  Accordingly, the following discussion sets forth alternate treatments of US Bank's secured claim, depending upon whether US Bank makes the § 1111(b) election or not.

#### (i)  US Bank's Treatment if the § 1111(b) Election is Not Made

If US Bank does not make the § 1111(b) election, then pursuant to § 506(a)(1) of the Bankruptcy Code, the amount of US Bank's Allowed Secured Claim shall be limited to the value of its collateral, which US Bank asserts (and the Debtor does not contest) is $27,100,000.  The remainder of US Bank's Allowed Claim shall be treated as a general unsecured claim in Class 5.  The Debtor intends to pay US Bank's Allowed Secured Claim in full, with interest at the Plan Rate, over a period of seven years.

Specifically, the Debtor will execute and deliver to US Bank a promissory note (the "New US Bank Note") in the principal face amount of $27,100,000, *i.e.* the amount of US Bank's Allowed Secured Claim.  The New US Bank Note will mature and become fully due and payable on the 7th anniversary of the Effective Date (the "New US Bank Note Maturity Date").  During the term of the New US Bank Note, the Debtor will make monthly principal and interest payments to US Bank based upon a 25 year amortization schedule with interest at the Plan Rate.  On the New US Bank Note Maturity Date, all remaining amounts of principal and interest due under the New US Bank Note will be immediately due and payable, and will be paid by the Debtor to US Bank either through a sale of the Real Property or through refinancing of the Real Property.  The first payment of principal and interest will be made on the Effective Date, and each monthly payment

thereafter will be made on the first business day of each month during the term of the New US Bank Note.

US Bank will retain its existing lien on the property that served as collateral for US Bank's Claim pre-petition until the New US Bank Note has been satisfied in full. At any time prior to the end of the term, the Debtor may pay the balance of the New US Bank Note without penalty.

The Debtor anticipates that, during the first approximately 24 months following the Effective Date of the Plan, before the occupancy of the Real Property becomes stabilized, the Real Property may not generate sufficient net cash flow, after paying operating expenses, to make the full amount of monthly principal and interest payments payable under the New US Bank Note (the "Monthly Note Payments"). Accordingly, on the Effective Date of the Plan, as part of the New Value infused by RCCH, or the Successful Bidder, RCCH or the Successful Bidder will deposit $3,000,000 into an interest bearing reserve account (the "Reserve Account") which will be specifically earmarked and used to pay any cash flow deficiency between the monthly net cash flow generated by the Real Property and the Monthly Note Payments during the term of the New US Bank Note (a "Cash Flow Deficiency"). To the extent that the use of the funds in the Reserve Accounts will result in the amount of funds in the Reserve Account being reduced to an amount below $200,000, at any time during the term of the New US Bank Note, the Reorganized Debtor (from any retained excess cash flow) or RCCH, or the Successful Bidder, if any, (from an additional contribution of capital) will replenish the Reserve Account such that the Reserve Account shall always be maintained in the total amount of $200,000 until the New US Bank Note matures.

The failure to maintain the Reserve Account in the total amount of at least $200,000 will constitute a default under the New US Bank Note and the lien in the collateral securing the New US Bank Note.

Immediately upon payment, in full, of the New US Bank Note, US Bank's Allowed Secured Claim, and its secured interest in the Real Property, will be deemed satisfied, extinguished, released and discharged, in full.

2707020.2

### (ii)  US Bank's Treatment if the § 1111(b) Election is Made

If US Bank makes the § 1111(b) election, then US Bank's entire Allowed Claim will be treated as fully secured, and US Bank will not have any claims in Class 5.

In this event, the Debtor will treat US Bank's Allowed Claim as follows:

● US Bank will retain its lien on the Real Property in the full amount of its Allowed Claim, as such Allowed Claim is determined by the Court.

● For purposes of this analysis, the Debtor assumes that (i) US Bank's Allowed Claim will be established at no more than $59,000,000, rather than the nearly $71,000,000 asserted by US Bank in its pleadings filed in this case; and (ii) the value of US Bank's collateral is $27.1 million. The actual amount of US Bank's Allowed Claim, and the value of its collateral base, will be established by the Court. Attached hereto Exhibit "B" is a cash flow projection reflecting various alternative scenarios for the treatment of US Bank's claim depending on three different estimated collateral values ($27.1 million, $28 million and $29 million) and three different claim amounts ($59 million, $65 million and $71 million) (collectively, the "Alternative Scenarios"). The Court may determine that these various amounts are different than those set forth in the projections; consequently, Exhibit "B" to the Disclosure Statement is merely illustrative of the Alternative Scenarios and the final projections of cash flow may be adjusted accordingly following the Court's determinations of these variables.

● The Reorganized Debtor will make an initial principal payment to US Bank on the Effective Date of the Plan in the amount of $425,000 from the New Value contributed by RCCH or the Successful Bidder, if any.

● The Reorganized Debtor will pay the remaining total amount of US Bank's Allowed Claim over a period of 300 months as follows:

(i) In the first year following the Effective Date of the Plan, the Reorganized Debtor will make payments of $126,250 per month to US Bank, for a total annual payment of $1,515,000;

(ii) In the second year following the Effective Date of the Plan, the Reorganized Debtor will make payments of $141,250 per month to US Bank, for a total annual payment

of $1,695,000 and a total payment on US Bank's Allowed Claim at the end of twenty four months in the amount of $3,210,000;

(iii)     In the third year following the Effective Date of the Plan, the Reorganized Debtor will make payments of $156,250 per month to US Bank, for a total annual payment of $1,875,000 and a total payment on US Bank's Allowed Claim at the end of thirty six months in the amount of $5,085,000;

(iv)     In the fourth year following the Effective Date of the Plan, the Reorganized Debtor will make payments of $171, 250 per month to US Bank, for a total annual payment of $2,055,000 and a total payment on US Bank's Allowed Claim at the end of forty eight months in the amount of $7,140,000;

(v)     In the fifth year following the Effective Date of the Plan, the Reorganized Debtor will make payments of $186,250 per month to US Bank, for a total annual payment of $2,235,000 and a total payment on US Bank's Allowed Claim at the end of sixty months in the amount of $9,375,000;

(vi)     In the sixth through tenth years following the Effective Date of the Plan, the Reorganized Debtor will make payments of $186,250 per month to US Bank, for  total annual payments of $2,235,000 per year and a total payment on US Bank's Allowed Claim at the end of 120 months in the amount of $20,550,000;

(vii)     In the eleventh through fifteenth years following the Effective Date of the Plan, the Reorganized Debtor will make payments of $201,250 per month to US Bank, for total annual payments of $2,415,000 per year and a total payment on US Bank's Allowed Claim at the end of 180 months in the amount of $32,625,000;

(viii)     In the sixteenth through twentieth years following the Effective Date of the Plan, the Reorganized Debtor will make payments of $216,250 per month to US Bank, for total annual payments of $2,595,000 per year and a total payment on US Bank's Allowed Claim at the end of 240 months in the amount of $45,600,000;

(ix)     In the twenty-first through twenty-fifth years following the Effective Date of the Plan, the Reorganized Debtor will make payments of $216,250 per month to US Bank,

15

for total annual payments of $2,595,000 per year until the total amount of US Bank's Allowed Claim of $59,000,000 (including the initial principal payment of $425,000) is paid in full.

● Notwithstanding the foregoing payment schedule, the Reorganized Debtor shall have the right and ability to make principal reduction payments to US Bank during the twenty-five year payoff period, without penalty, from excess cash flow, if any, from the operations of the Real Property.

● The foregoing repayment schedule reflects that US Bank will receive an internal rate of return (*i.e.*, interest) at the rate of 6.52% per annum during the 25 year repayment period, based on the assumption that the value of US Bank's collateral is $27.1 million and the allowed amount of its claim is $59 million.

● In the event the Court finds that US Bank's Allowed Claim is greater than $59,000,000 and/or that the value of US Bank's collateral is more than $27.1 million, then (i) the stream of payments on US Bank's claim will remain the same as set forth above but (ii) any balance of US Bank's Allowed Claim remaining on the 25th anniversary of the Effective Date will be paid in full at such time through either the sale of the Property or a refinancing of the Property. Attached hereto as Exhibit "C" is an "IRR Sensitivity Analysis" reflecting the internal rate of return (or interest) that US Bank will receive under the Alternative Scenarios. Generally, the IRR Sensitivity Analysis reflects the following interest to be paid to US Bank under the Alternative Scenarios:

|  | $59 million | $65 million | $71 million |
|---|---|---|---|
| $27.1 million | 6.52% | 6.95% | 7.32% |
| $28 million | 6.20% | 6.64% | 7.02% |
| $29 million | 5.86% | 6.31% | 6.70% |

● The Debtor anticipates that, during the first approximately 24 months following the Effective Date of the Plan, before the occupancy of the Real Property becomes stabilized, the Real Property may not generate sufficient net cash flow, after paying operating expenses, to make the

16

full amount of monthly payments called for in the foregoing payment schedule. Accordingly, just as with the Debtor's treatment of US Bank's claim if US Bank does not make the § 1111(b) election, on the Effective Date of the Plan, as part of the New Value infused by RCCH or the Successful bidder, if any, RCCH or the Successful Bidder will deposit $3,000,000 into the Reserve Account, which will be specifically earmarked and used to pay any cash flow deficiency between the monthly net cash flow generated by the Real Property and the required monthly payments set forth in the foregoing payment schedule. To the extent that the use of the funds in the Reserve Accounts will result in the amount of funds in the Reserve Account being reduced to an amount below $200,000, at any time during the 25 year payment period, the Reorganized Debtor (from any retained excess cash flow) or RCCH, or the Successful Bidder, if any, (from an additional contribution of capital) will replenish the Reserve Account such that the Reserve Account shall always be maintained in the total amount of $200,000 until the US Bank's Allowed Claim is paid in full matures. The failure to maintain the Reserve Account in the total amount of at least $200,000 will constitute a default under the Plan and the lien in the Real Property securing the New US Bank Note.

- Immediately upon payment, in full, of US Bank's Allowed Claim, US Bank's secured interest in the Real Property will be deemed satisfied, extinguished, released and discharged, in full.

- The Reorganized Debtor reserves its right and ability to sell or refinance the Real Property at any time during the twenty-five year payment period, so long as the net sale or loan proceeds (after payment of costs of sale or loan) are sufficient to pay the remaining amount of US Bank's Allowed Claim in full.

        **b.**       **Class 2-B –Allowed Secured Claim of Maricopa County**

This Class consists of the Allowed Secured Claim of Maricopa County, Arizona ("Maricopa County"), if any, that is secured by a tax lien on the Real Property. This Class is impaired.

Commencing on the Effective Date, the Allowed Secured Claim of Maricopa County, if any, will be paid in equal quarterly payments of principal and interest over a term of 1 year.

Interest will accrue and will be paid at the statutory rate plus 2%. The County will retain its existing secured interest in the Real Property until this claim has been satisfied in full.

If funds generated from the normal operations of the Real Property are insufficient to pay the secured real property tax claims as provided herein, the payments required herein to Maricopa County will be made from the New Value contributed by RCCH or the Successful Bidder, if any.

c.    **Class 2-C –Allowed Secured Claim of Fennemore Craig**

This Class consists of the Allowed Secured Claim of Fennemore Craig in the amount of $26,439. This Class is impaired.

Although the retention agreement between Fennemore Craig and the Debtor does not provide for the payment of interest on Fennemore Craig's claim, Fennemore Craig's Allowed Secured Claim shall include interest at the Plan Rate from the date that the amount due and owing to Fennemore Craig first became 60 days past due until the Effective Date of the Plan. On the Effective Date of the Plan, Fennemore Craig will be entitled to apply its collateral (consisting of a cash retainer) to the principal amount of Fennemore Craig's claim plus any such accrued interest. Regardless of the total amount of Fennemore Craig's claim, Fennemore Craig's application of its retainer to the principal amount of the claim and any accrued interest shall be deemed to be in full and final satisfaction of Fennemore Craig's claims against the Debtor. To the extent that the amount of the retainer is greater than the amount of Fennemore Craig's claim, including accrued interest, Fennemore Craig shall deliver any excess funds to the Debtor after application of the retainer to Fennemore Craig's claim.

d.    **Class 2-D –Allowed Secured Claim of Larson Allen**

This Class consists of the Allowed Secured Claim of Larson Allen in the amount of $3,941.56. This Class is impaired.

Although the retention agreement between Larson Allen and the Debtor provides for the payment of interest on Larson Allen's claim at the rate of 1.5% per month, Larson Allen's Allowed Secured Claim shall include interest at the Plan Rate from the date that the amount due and owing to Larson Allen first became 60 days past due until the Effective Date of the Plan. On the Effective Date of the Plan, Larson Allen will be entitled to apply its collateral (consisting of a

18

cash retainer) to the principal amount of Larson Allen's claim plus any such accrued interest. Regardless of the total amount of Larson Allen's claim, Larson Allen's application of its retainer to the principal amount of the claim and any accrued interest shall be deemed to be in full and final satisfaction of Larson Allen's claims against the Debtor. To the extent that the amount of the retainer is greater than the amount of Larson Allen's claim, including accrued interest, Larson Allen shall deliver any excess funds to the Debtor after application of the retainer to Larson Allen's claim.

### 3. Class 3: Allowed Claim of Eye Level Holdings

This Class consists of the Allowed Claim of Eye Level Holdings for unreimbursed tenant improvement costs and expenses owing by the Debtor to Eye Level Holdings in the amount of approximately $130,346 ("Eye Level Holdings' Reimbursement Claim"). This Class is impaired.

Eye Level Holdings' Reimbursement Claim shall not accrue interest. Eye Level Holdings' Reimbursement Claim shall be satisfied and paid in full by Eye Level Holdings setting off against the monthly rent owing by Eye Level Holdings to the Reorganized Debtor the following amounts pursuant to the following schedule until Eye Level Holdings' Reimbursement Claim is satisfied in full:

For the first six months that rent is due from Eye Level Holdings to the Debtor following the Effective Date, Eye Level Holdings shall be entitled to set off the amount of $5,000 per month from its monthly rent payment to the Reorganized Debtor. For the following six months, Eye Level Holdings shall be entitled set off the amount of $7,000 per month from its monthly rent payment to the Reorganized Debtor. For the following six months, Eye Level Holdings shall be entitled set off the amount of $10,000 per month from its monthly rent payment to the Reorganized Debtor until Eye Level Holdings' Reimbursement Claim is paid in full.

### 4. Class 4: Tenant Security Deposits

This Class consists of all Allowed Unsecured Claims of tenants for pre-petition security deposits held by the Debtor in the total aggregate amount of approximately $212,592.86. This Class is impaired.

The Reorganized Debtor shall retain its right and ability to determine whether and what

extent a tenant is entitled to the return of its security deposit pursuant to the terms of the lease between the Debtor and the tenant and applicable state law. However, notwithstanding anything to the contrary in the lease between the Debtor and its tenants or in applicable law, valid and enforceable tenant security deposits will be paid to tenants within 90 days of the later of either (a) the date that the Debtor determines the appropriate amount of the security deposit to be returned or (b) the date the tenant vacates its premises. This 90 day delay is necessary in order to ensure that the Debtor has sufficient funds on hand to return the security deposit to the tenant, either from the cash flow of the Real Property or from an infusion of cash from one or more of the New Interest Holders.

### 5. Class 5: Unsecured Claims

This Class consists of all Allowed Unsecured Claims of Creditors that are not specifically treated elsewhere in the Plan (*e.g.*, this Class does not include the Allowed Claim of Eye Level Holdings, claims of tenants for security deposits, or any administrative or priority claims). If US Bank does not make the § 1111(b) election, then US Bank's unsecured deficiency claim—*i.e.*, the difference between the amount of US Bank's Allowed Claim and the value of the Real Property— will be included in this Class. If US Bank makes the § 1111(b) election, then US Bank will not have a deficiency claim and will not participate in distributions to holders in this Class 5. This Class is impaired.

#### a. Treatment of Allowed Unsecured Claims if US Bank Does Not Make the § 1111(b) Election

If US Bank does not make the § 1111(b) election, then Allowed Unsecured Claims will be treated as follows:

● If RCCH is the successful bidder at the auction discussed below, RCCH and/or any other affiliates of the Debtor holding Unsecured Claims, including Cavan Management Services (the manager of RCCH) ("CMS"), will waive their Unsecured Claims against the Debtor and the Debtor's Estate, and will not participate in any distribution to Class 5 Claimants. However, if RCCH is not the successful bidder at the auction, then RCCH and/or any other affiliates of the Debtor holding Allowed Unsecured Claims against the Debtor, including CMS, shall participate in the distributions to this Class.

2707020.2

- The Allowed Unsecured Claims in this Class will be treated as follows:

(i) First, Allowed Unsecured Claims will share, pro-rata, in a distribution of the sum of $500,000 in cash (the "Unsecured Distribution Amount") paid by the Reorganized Debtor, from the New Value contribution, on the 90th day following the Effective Date of the Plan.

(ii) Second, the Reorganized Debtor will issue to each holder of an Allowed Unsecured Claim its pro rata portion of a $5 million subordinated debenture payable to holders of Allowed Unsecured Claims (the "Subordinated Debenture"). The Subordinated Debenture will not accrue interest. The Subordinated Debenture will be secured by a second position lien in and to the Real Property, subject only to real property taxes and the Allowed Secured Claim of US Bank. The Reorganized Debtor shall not be required to make periodic payments to the holders of the Subordinated Debenture. However, the Subordinated Debenture will be fully due and payable on the 7th anniversary of the Effective Date of the Plan or upon the sale or refinancing of the Real Property.

- RCCH, or the Successful Bidder, if any, will contribute the Unsecured Distribution Amount, as part of the New Value contribution, into an account created by the Reorganized Debtor for the receipt of such funds (the "Unsecured Reserve Account").

- Upon their receipt of (a) their respective pro rata portions of the Unsecured Distribution Amount and (b) their pro rata distributions from the payment of the Subordinated Debenture, all Allowed Unsecured Claims in this Class shall be deemed paid and discharged in full.

  **b.  Treatment of Allowed Unsecured Claims if US Bank Makes the § 1111(b) Election**

If US Bank makes the § 1111(b) election, then Allowed Unsecured Claims will be treated as follows:

- RCCH and/or any other affiliates of the Debtor holding Unsecured Claims, including CMS, will waive their Unsecured Claims against the Debtor and the Debtor's Estate, and will not participate in any distribution to Class 5 Claimants.

- The Allowed Unsecured Claims in this Class (again, not including any claim by US Bank, Eye Level Holdings, or tenants for security deposits, which claims are treated elsewhere in

this Plan) will be paid in full but without interest, by the Reorganized Debtor from the New Value contribution, on the 90th day following the Effective Date of the Plan. The Debtor estimates that these claims will not exceed approximately $75,000.

● Upon their receipt of the funds from the Reorganized Debtor, all Allowed Unsecured Claims in this Class shall be deemed paid and discharged in full.

### 6. Class 6: Interest Holders

Class 6 consists of all Allowed Interests of the Interest Holder in the Debtor. The Debtor's Interest Holder is RCCH. RCCH will purchase the equity interests in the Reorganized Debtor by the contribution of cash to the Reorganized Debtor, on the Effective Date, in the amount of $8,000,000 (*i.e.*, the New Value). The New Value will be used to:

(a) pay the amount necessary to pay all Class 1 Allowed Priority Claims as set forth above;

(b) pay the amounts to Maricopa County as set forth above, to the extent that cash flow from the Real Property is insufficient to pay the taxes;

(c) pay the $425,000 initial principal payment to US Bank, if US Bank makes the § 1111(b) election;

(d) pay the amount necessary to fund the Reserve Account in the amount of $3,000,000 as required by the treatment of Class 2-A Claimants as set forth above;

(e) pay either (1) the Unsecured Distribution Amount of $500,000, if US Bank does not make the § 1111(b) election or (2) the amount necessary to pay Allowed Unsecured Claims in Class 5 (estimated at approximately $75,000), in full, if applicable if US Bank makes the § 1111(b) election; and

(f) fund a capital reserve account, in the amount of approximately $4.5 million, necessary to fund, among other things, (1) tenant improvements, (2) broker's commissions, and (3) other necessary and appropriate capital expenses of the Real Property to ensure that the value of the Real Property is maintained.

If the Court determines that, under the circumstances, the New Value to be contributed by RCCH is insufficient, or that other parties-in-interest should be allowed to bid for the equity interests in the Reorganized Debtor, then other interested parties may bid for the equity interests in

2707020.2

the Reorganized Debtor by meeting all of the terms and conditions identified below. Such bids shall be made pursuant to the following auction procedures and terms:

a. The auction of the equity interests in the Reorganized Debtor will be held at the time of the Confirmation Hearing in the courtroom, with the Court presiding over the bidding.

b. Any party wishing to bid on the equity interests of the Reorganized Debtor must satisfy the following requirements to be a "Qualified Bidder":

i. The bidder must be a current Creditor or Interest Holder of the Debtor. This requirement is necessary to avoid any potential registration or like requirements of any applicable securities laws or regulations.

ii. The bidder must deposit $1,000,000 in cash ("Deposit") with the Debtor's counsel at least twenty-five days prior to the Confirmation Hearing. Any Deposits will be returned to any unsuccessful bidder on the day following the Confirmation Hearing. The Deposit, plus any additional amounts bid by the Successful Bidder at the auction for the equity interests in the Reorganized Debtor, will be delivered to the Reorganized Debtor on the Effective Date of the Plan.

iii. At least twenty-five days prior to the Confirmation Hearing, all bidders must provide satisfactory evidence to the Debtor of their ability to make a cash payment to the Debtor, on the Effective Date of the Plan, in the amount of no less than $8,250,000. To the extent that the Debtor contests the sufficiency of the evidence submitted regarding a bidder's ability to pay such amount, the evidence will be presented to the Court at the Confirmation Hearing, prior to bidding, and the Court will make a determination as to the sufficiency of the evidence and whether the bidder should be deemed to be a Qualified Bidder.

iv. At least twenty-five days prior to the Confirmation Hearing, all bidders must provide satisfactory evidence to the Debtor of their ability to operate the Reorganized Debtor in such a manner as to satisfy the requirements of this Plan, including payments to administrative claimants, secured creditors and unsecured creditors, on the terms and conditions set forth herein. To the extent that the Debtor contests the sufficiency of the

2707020.2

evidence submitted regarding a bidder's ability to make payments as required by the Plan, the evidence will be presented to the Court at the Confirmation Hearing, prior to bidding, and the Court will make a determination as to the sufficiency of the evidence and whether the bidder should be deemed to be a Qualified Bidder.

v.      At least twenty-five days prior to the Confirmation Hearing, all bidders must provide satisfactory evidence to the Debtor that they are authorized to do business in the State of Arizona, and have, or have the ability to obtain, any and all necessary permits and/or licenses to operate the Real Property.  To the extent that the Debtor contests the sufficiency of such evidence, the evidence will be presented to the Court at the Confirmation Hearing, prior to bidding, and the Court will make a determination as to the sufficiency of the evidence and whether the bidder should be deemed to be a Qualified Bidder.

c.      All bids for the interests in the Reorganized Debtor shall be in increments of no less than $250,000.

d.      In order for a Qualified Bidder's bid to be determined to be higher and better than the New Value to be contributed by RCCH as set forth above, the Qualified Bidder's bid must:

i.      Exceed, by at least $250,000, RCCH's $8 million bid; and

ii.      Provide that the Qualified Bidder will comply with and perform under the terms of this Plan, including the payments to creditors (including tenant security deposits) as provided herein.

e.      RCCH shall have the right and ability to bid at the auction.

Competing bids will be assessed by the Court for their relative merits including, but not limited to, the amount of the bid and the expertise of the would-be New Interest Holder to manage and guide the Reorganized Debtor after the Effective Date and to satisfy the requirements of this Plan, including its ability to make the payments to creditors required herein and to satisfy the assumed obligations as required herein.

On the Effective Date, if RCCH is not the successful bidder at the auction, then the Successful Bidder at the auction must deliver its cash bid to the Reorganized Debtor and, upon

24

such delivery, the Successful Bidder will be deemed to hold the equity interests in the Reorganized Debtor, subject to all terms and conditions of this Plan, including the obligations to other creditors as provided herein and the assumption of liabilities as provided herein.

### D. MEANS FOR EXECUTING THE PLAN.

#### 1. Funding

The Plan will be funded by operation of the Property and a capital infusion in the amount of the New Value by RCCH or the Successful Bidder, if an auction as described above is held. As a showing of good faith and commitment to the Plan, RCCH will place $250,000 in "escrow" in the trust account of the Debtor's bankruptcy counsel on or before the Confirmation Date. These funds will become a part of the Estate and will fund the New Value contribution obligations set forth herein at confirmation ***only in the event that*** RCCH is the successful bidder for the equity interests in the Reorganized Debtor. Additionally, these funds will only be available to, and become a part of, the Estate if a Confirmation Order confirming this Plan is entered and becomes a Final Order.

#### 2. Liquidation of Estate Property

The Debtor shall have the authority to retain such brokers, agents, counsel, or representatives as it deems necessary to market, lease and/or sell assets of the Reorganized Debtor.

#### 3. Management

The Plan will be implemented by the retention of the Debtor's existing management, CMS. This implementation will also include the management and disbursement of the funds infused by RCCH, or the Successful Bidder, if any, as set forth above and in accordance with the terms of this Plan.

#### 4. Disbursing Agent

The Reorganized Debtor shall act as the Disbursing Agent under the Plan.

#### 5. Documentation of Plan Implementation

In the event any entity which possesses an Allowed Secured Claim or any other lien in any of the Debtor's property for which the Plan requires the execution of any documents to incorporate the terms of the Plan, fails to provide a release of its lien or execute the necessary documents to

satisfy the requirements of the Plan, the Debtor may record a copy of this Plan or the Confirmation Order with the appropriate governmental agency and such recordation shall constitute the lien release and creation of any necessary new liens to satisfy the terms of the Plan. If the Debtor deems advisable, it may obtain a further Order from the Court that may be recorded in order to implement the terms of the Plan.

### 6.   New Obligations

Any Allowed Claims which are otherwise impaired herein, and which are paid in deferred payments, shall be a New Obligation of the Reorganized Debtor under the terms described herein and completely replace any pre-confirmation obligations of the Debtor.

## VII.   EFFECT OF CONFIRMATION.

Except as otherwise provided in the Plan or the Confirmation Order, Confirmation acts as a Discharge, effective as of Confirmation, of any and all debts of the Debtor that arose any time before the entry of the Confirmation Order including, but not limited to, all principal and all interest accrued thereon, pursuant to §1141(d)(1) of the Bankruptcy Code. The Discharge shall be effective as to each Claim, regardless of whether a Proof of Claim thereon was filed, whether the Claim is an Allowed Claim, or whether the Holder thereof votes to accept the Plan.

In addition, any pre-confirmation obligations of the Debtor dealt with in the Plan shall be considered New Obligations of the Debtor, and these New Obligations shall not be considered in default unless and until the Reorganized Debtor defaults on the New Obligations pursuant to the terms of the Plan. The New Obligations provided for in the Plan shall be in the place of, and completely substitute for, any pre-Confirmation obligations of the Debtor. Once the Plan is confirmed, the only obligations of the Debtor shall be such New Obligations as provided for under the Plan.

## VIII.   LIQUIDATION ANALYSIS

If the Plan is not confirmed, and the Debtor's assets were liquidated instead, it is likely that only US Bank would recover anything from such liquidation, and all other creditors (other than Fennemore Craig and Larson Allen) will not recover anything from the Debtor or the Debtor's

2707020.2

Estate.  Indeed, the value of the Debtor's Property is $27.1 million, while US Bank's asserted secured claim encumbering the Property is at least approximately $57 million.  Furthermore, the Debtor's personal property is virtually worthless and is likely covered by US Bank's security interest in the Debtor's assets.  Although the Debtor owns a significant claim against a related entity, the Debtor is informed and believes that such claim is uncollectible.

The Debtor's Plan provides a better recovery than such a liquidation, regardless of whether US Bank makes the § 1111(b) election.  First, if US Bank makes the § 1111(b) election, unsecured claims, other than related party claims, will be paid in full from the New Value contribution.  If US Bank does not make the election, then Allowed Unsecured Creditors will share in a pro rata distribution of $500,000 on the Effective Date and a pro rata interest in the Subordinated Debenture.  Finally, under the Plan, US Bank will recover either (a) the value of its collateral, plus a market rate of  interest, plus its share of the Unsecured Distribution Amount and Subordinated Debenture, if it does not make the § 1111(b) election; or (b) cash payments in the total amount of its Allowed Claim if it makes the § 1111(b) election.  Either of these treatments will result in a better recovery to US Bank than if the Property were liquidated.

Thus, the Plan provides for a better recovery to creditors than a liquidation.

## IX.    TAX CONSEQUENCES

Pursuant to §1125(a)(1) of the Bankruptcy Code, the Debtor is to provide a discussion of the potential material tax consequences of the Plan to the Debtor, any successor to the Debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant Class to make an informed judgment about the Plan. However, the Debtor need not include such information about any other possible or proposed plan. In determining whether the Disclosure Statement provides adequate information, the Court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information. The following discussion summarizes certain considerations that may affect the anticipated federal income tax consequences of the Plan's implementation to Creditors and to the Debtor.  It does not address all federal income

27

tax consequences of the Plan nor does it address the state or local income tax or other state or local tax consequences of the Plan's implementation to Creditors or to the Debtor.

This description of the federal income tax consequences of implementing the Plan is based on Debtor's interpretation of the applicable provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), the regulations promulgated thereunder, and other relevant authority. Debtor's interpretation, however, is not binding on the IRS or any court. The Debtor has not obtained, nor does it intend to obtain, a private letter ruling from the IRS, nor has the Debtor obtained an opinion of counsel with respect to any of these matters. The discussion below is general in nature and is not directed to the specific tax situation of any particular interested taxpayer. **For these reasons, all Creditors and the Interest Holder should consult with their own tax advisors as to the tax consequences of implementation of the Plan to them under applicable federal, state, and local tax laws.**

### A.    Tax Consequences to the Debtor

In general, pursuant to IRC Section 108, the amount of any debt of a corporation that is partially or totally discharged pursuant to a Title 11 bankruptcy case is excluded from gross income. According to IRC Section 108(b), the amount of debt discharge income ("DDI") that is excluded from gross income must be applied to reduce the tax attributes of the Debtor. The Debtor's tax attributes are reduced in the following order: (1) net operating losses ("NOLs"); (2) general business credits; (3) minimum tax credit; (4) capital loss carryovers; (5) reduction in tax basis of the Debtor's property; (6) passive activity loss and credit carryovers; and (7) foreign tax credit carryovers. The Debtor may elect to apply the debt discharge exclusion first to depreciable property and thereafter to the tax attributes in the above-prescribed order.

### B.    Tax Consequences to the Secured and Unsecured Creditors

Both the Secured Claimants and/or the Unsecured Claimants may be required to report income or be entitled to a deduction as a result of implementation of the Plan. The exact tax treatment depends on, among other things, each Claimant's method of accounting, the nature of each Claimant's claim, and whether and to what extent such Claimant has taken a bad debt

28

deduction in prior taxable years with respect to the particular debt owed to it by one of the Debtors. **Each Holder of a secured claim or an unsecured claim is urged to consult with his, her, or its own tax advisor regarding the particular tax consequences of the treatment of his, her, or its claim under the Plan.**

## X.       OBJECTIONS TO AND ESTIMATIONS OF CLAIMS.

### A.       Objections and Bar Date for Filing Objections.

As soon as practicable, but in no event later than 45 days after the Effective Date, objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made pursuant to the Bankruptcy Code and the Bankruptcy Rules. Objections filed after such date will be barred.

### B.       Settlement of Claims.

Settlement of any objection to a Claim not exceeding $10,000 shall be permitted on the eleventh (11th) day after notice of the settlement has been provided to the Debtor, the Creditors, the settling party, and other persons specifically requesting such notice, and if on such date there is no written objection filed, such settlement shall be deemed approved. In the event of a written objection to the settlement, the settlement must be approved by the Court on notice to the objecting party.

### C.       Estimation of Claims.

For purposes of making distributions provided for under the Plan, all Claims objected to shall be estimated by the Disbursing Agent at an amount equal to (i) the amount, if any, determined by the Court pursuant to §502(c) of the Bankruptcy Code as an estimate for distribution purposes; (ii) an amount agreed to between the Debtor and the Claimant; or, (iii) that amount set forth as an estimate in the Plan or Disclosure Statement. Notwithstanding anything herein to the contrary, no distributions shall be made on account of any Claim until such Claim is an Allowed Claim.

### D.       Unclaimed Funds and Interest.

Distribution to Claimants shall be mailed by the Reorganized Debtor to the Claimants at the address appearing on the master mailing matrix unless the Claimant provides the Reorganized

2707020.2

Debtor with an alternative address. For a period of one year from the date that a distribution was to be made by the disbursing agent but has gone uncollected by the Claimant, the disbursing agent shall retain any distributions otherwise distributable hereunder which remain unclaimed or as to which the disbursing agent has not received documents required pursuant to the Plan. Thereafter, the unclaimed funds shall be deposited in the appropriate distribution account for distribution to other Claimants entitled to participate in such respective fund.

## XI. NON-ALLOWANCE OF PENALTIES AND FINES.

No distribution shall be made under the Plan on account of, and no Allowed Claim, whether Secured, Unsecured, Administrative, or Priority, shall include any fine, penalty, exemplary or punitive damages, late charges, default interest or other monetary charges relating to or arising from any default or breach by the Debtor, and any Claim on account thereof shall be deemed Disallowed, whether or not an objection was filed to it.

## XII. CLOSING OF CASE.

Until these cases are officially closed, the Reorganized Debtor will be responsible for filing pre- and post-confirmation reports required by the United States Trustee and paying the quarterly post-confirmation fees of the United States Trustee, in cash, pursuant to 28 U.S.C. §1930, as amended. Pursuant to 11 U.S.C. §1129(a)(12), all fees payable under §1930 of Title 28, as determined by the Court at the hearing on confirmation of the Plan, will be paid, in cash, on the Effective Date.

## XIII. MODIFICATION OF THE PLAN.

In addition to its modification rights under §1127 of the Bankruptcy Code, the Debtor may amend or modify the Plan at any time prior to Confirmation without leave of the Court. The Debtor may propose amendments and/or modifications of the Plan at any time subsequent to Confirmation with leave of the Court and upon notice to Creditors. After Confirmation of the Plan, the Debtor may, with approval of the Court, as long as it does not materially or adversely affect the interests of Creditors, remedy any defect or omission or reconcile any inconsistencies of the Plan, or in the Confirmation Order, if any may be necessary to carry out the purposes and intent of the Plan.

## XIV.    JURISDICTION OF THE COURT.

The Court will retain jurisdiction until the Plan has been fully consummated for, including but not limited to, the following purposes:

1.    The classification of the Claims of any Creditors and the re-examination of any Claims which have been allowed for the purposes of voting, and for the determination of such objections as may be filed to the Creditor's Claims. The failure by the Debtor to object to or examine any Claim for the purpose of voting shall not be deemed to be a waiver of the Debtor's rights to object to or to re-examine the Claim in whole or in part.

2.    To determine any Claims which are disputed by the Debtor, whether such objections are filed before or after Confirmation, to estimate any Un-liquidated or Contingent Claims pursuant to 11 U.S.C. § 502(c)(1) upon request of the Debtor or any holder of a Contingent or Un-liquidated Claim, and to make determination on any objection to such Claim.

3.    To determine all questions and disputes regarding title to the assets of the Estate, and determination of all causes of action, controversies, disputes or conflicts, whether or not subject to action pending as of the date of Confirmation, between the Debtor and any other party, including but not limited to, any rights of the Debtor to recover assets pursuant to the provisions of the Bankruptcy Code.

4.    The correction of any defect, the curing of any omission or any reconciliation of any inconsistencies in the Plan, or the Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan.

5.    The modification of the Plan after Confirmation, pursuant to the Bankruptcy Rules and the Bankruptcy Code.

6.    To enforce and interpret the terms and conditions of the Plan.

7.    The entry of an order, including injunctions, necessary to enforce the title, rights and powers of the Debtor, and to impose such limitations, restrictions, terms and conditions of such title, right and power that this Court may deem necessary.

8.    The entry of an order concluding and terminating this case.

2707020.2

## XV.     RETENTION AND ENFORCEMENT OF CLAIMS.

Pursuant to §1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce any and all claims of the Debtor, except those claims specifically waived herein.  Any retained causes of action include, but are not limited to, all avoidance actions, fraudulent conveyance actions, preference actions, and other claims and causes of action of every kind and nature whatsoever, arising before the Effective Date which have not been resolved or disposed of prior to the Effective Date, whether or not such claims or causes of action are specifically identified in the Disclosure Statement.

Any recovery obtained from retained causes of action shall become an additional asset of the Debtor, unless otherwise ordered by the Court, and shall be available for distribution in accordance with the terms of the Plan.

## XVI.     EXECUTORY CONTRACTS.

The Debtor hereby expressly assumes any and all tenant leases in existence as of the Confirmation Date and all executory contracts listed in the Debtor's Schedules of Assets and Liabilities.  Every other executory contract and/or unexpired lease of the Debtor not expressly assumed by this Plan is hereby rejected.

Claims under § 502(g) of the Code arising as a result of the rejection of executory contracts or unexpired leases shall be filed no later than 30 days after the Confirmation Date.  Any such Claims not timely filed and served shall be Disallowed.

## XVII.     REVESTING.

Except as provided for in the Plan or in the Confirmation Order, on the Effective Date the Reorganized Debtor shall be vested with all the property of the Estate free and clear of all claims, liens, charges, and other interests of Creditors, arising prior to the Effective Date.  Upon the Effective Date, the Reorganized Debtor shall operate their business free of any restrictions.

## XVIII.     DISCLAIMER.

Court approval of this Disclosure Statement and the accompanying Plan of Reorganization, is not a certification of the accuracy of the contents thereof.  Furthermore, Court approval of these

documents does not constitute the Court's opinion as to whether the Plan should be approved or disapproved.

## XIX.     RISKS.

The risk of the Plan lies with the Debtor's ability to fund the Plan and ultimately to refinance or sell the Property to pay off its creditors.  If the funds to be infused by the Interest Holder are infused, this will lessen the risk accordingly.  However, the success of the Debtor depends in large part on the recovery of the national economy over the next several years following confirmation.

## XX.     PROPONENTS RECOMMENDATION/ALTERNATIVES TO THE PLAN.

The Debtor recommends that all creditors entitled to vote for the Plan do so.  The Debtor's Plan will pay US Bank the full amount of its secured claim and provide funds to pay unsecured creditors.  The alternatives to confirmation of the Plan would be either conversion of this case to a case under Chapter 7 of the Bankruptcy Code or its dismissal.

Dismissal of this case would result in the foreclosure of the Property by US Bank.  In such a case, Unsecured Creditors will receive nothing on account of their claims.

Conversion will result in the appointment of a Chapter 7 trustee and, most likely, the hiring of an attorney by the trustee.  Expenses incurred in administering the Chapter 7 case would take priority in the right to payment over allowed, administrative expenses incurred in the Chapter 11 case.  Both Chapter 7 and Chapter 11 administrative expenses take priority over the payment of unsecured claims without priority.  In other words, conversion would likely decrease the net amount available to pay currently existing creditors.

The most likely effect of conversion of the case to a Chapter 7 would be a foreclosure on the Property by US Bank, and, as a result, Unsecured Creditors would receive nothing.

For all these reasons, the Debtor urges you to vote to accept the Plan and to return your ballots in time to be counted.

33

DATED: October 12, 2010.

POLSINELLI SHUGHART PC

By: _____
    John J. Hebert
    Mark W. Roth
    Philip R. Rudd
    CityScape Plaza
    One East Washington, Suite 1200
    Phoenix, AZ 85004
    *Attorneys for the Debtor*

**COPY** of the foregoing mailed (or served via electronic notification if indicated by an "*")
on October 12, 2010, to:

U.S. TRUSTEE'S OFFICE                    Richard Lorenzen * rlorenzen@perkinscoie.com
230 N. 1st Avenue, Suite 204             PERKINS COIE BROWN & BAIN, P.A.
Phoenix, AZ 85003                        2901 N. Central Ave., Suite 2000
                                         Phoenix, AZ 85012-2788


By:_____/s/ Cathie Bernales_____

# Raintree North

| For the Years Ending | Year 1 Sep-2011 | Year 2 Sep-2012 | Year 3 Sep-2013 | Year 4 Sep-2014 | Year 5 Sep-2015 | Year 6 Sep-2016 | Year 7 Sep-2017 |
|---|---|---|---|---|---|---|---|
| **Potential Gross Revenue** | | | | | | | |
| Base Rental Revenue | $ 3,130,713 | $ 4,282,229 | $ 5,573,428 | $ 5,719,151 | $ 5,869,186 | $ 6,645,077 | 7,221,611 |
| Absorption & Turnover Vacancy | $ (139,721) | $ (137,782) | $ (276,169) | $ (132,840) | $ (296,722) | $ (401,863) | (370,568) |
| Base Rent Abatements | $ (667,972) | $ (566,071) | $ (630,766) | $ (243,164) | $ (300,361) | $ (1,042,375) | (753,912) |
| Scheduled Base Rental Revenue | $ 2,323,020 | $ 3,578,376 | $ 4,666,491 | $ 5,343,147 | $ 5,272,103 | $ 5,200,839 | 6,097,131 |
| Base Rental Step Revenue | $ 41,034 | $ 478,383 | $ 544,184 | $ 655,345 | $ 781,464 | $ 491,782 | 299,050 |
| | | | | | | | |
| **Expense Reimbursement Revenue** | | | | | | | |
| Real estate taxes | $ 953 | $ 10 | $ 19,571 | $ 71,241 | $ 95,959 | $ 80,308 | 67,786 |
| Insurance | $ 77 | $ 1 | $ 2,827 | $ 8,973 | $ 11,775 | $ 9,780 | 8,249 |
| Utilities | $ 515 | $ 8 | $ 18,262 | $ 58,480 | $ 76,751 | $ 64,101 | 54,220 |
| Janitorial | $ 167 | $ 2 | $ 6,338 | $ 20,036 | $ 26,159 | $ 21,609 | 18,262 |
| Repairs & maintenance | $ 118 | $ 2 | $ 4,295 | $ 13,667 | $ 17,885 | $ 14,871 | 12,574 |
| HVAC | $ 40 | $ 1 | $ 1,039 | $ 3,598 | $ 4,815 | $ 4,229 | 3,627 |
| Grounds & landscape | $ 65 | $ 1 | $ 2,217 | $ 7,141 | $ 9,410 | $ 7,913 | 6,692 |
| Refuse Removal | $ 7 | $ - | $ 261 | $ 823 | $ 1,089 | $ 906 | 766 |
| Elevator | $ 24 | $ - | $ 743 | $ 2,456 | $ 3,253 | $ 2,785 | 2,366 |
| Exterminating | $ 7 | $ - | $ 261 | $ 823 | $ 1,089 | $ 906 | 766 |
| Security and Fire | $ 16 | $ - | $ 663 | $ 2,078 | $ 2,718 | $ 2,234 | 1,880 |
| Parking Lot | $ 3 | $ - | $ 145 | $ 425 | $ 545 | $ 419 | 348 |
| Property Managment | $ 84 | $ 1 | $ 4,790 | $ 16,345 | $ 21,070 | $ 16,944 | 14,627 |
| Misc. expenses | $ 16 | $ - | $ 601 | $ 1,903 | $ 2,495 | $ 2,066 | 1,751 |
| Total Reimbursement Revenue | $ 2,092 | $ 26 | $ 62,013 | $ 207,989 | $ 275,023 | $ 229,071 | $ 193,914 |
| | | | | | | | |
| Rooftop | $ 25,200 | $ 25,200 | $ 25,200 | $ 25,200 | $ 25,200 | $ 25,200 | 25,200 |
| Utility Reimb. | $ 12,000 | $ 12,120 | $ 12,241 | $ 12,364 | $ 12,487 | $ 12,612 | 12,738 |
| Other | $ 7,200 | $ 7,344 | $ 7,491 | $ - | $ - | $ - | - |
| Parking Revenue | $ 156,129 | $ 205,412 | $ 254,005 | $ 270,533 | $ 269,883 | $ 271,961 | 279,329 |
| Total | $ 200,529 | $ 250,076 | $ 298,937 | $ 308,097 | $ 307,570 | $ 309,773 | 317,267 |
| | | | | | | | |
| Total Potential Gross Revenue | $ 2,566,675 | $ 4,306,861 | $ 5,571,625 | $ 6,514,578 | $ 6,636,160 | $ 6,231,465 | 6,907,362 |
| General Vacancy | 0 | 0 | (114,990) | (140,959) | (27,714) | (15,630) | 0 |
| | | | | | | | |
| Effective Gross Revenue | 2,566,675 | 4,306,861 | 5,456,635 | 6,373,619 | 6,608,446 | 6,215,835 | 6,907,362 |
| | | | | | | | |
| **Operating Expenses** | | | | | | | |
| Real estate taxes | $ 888,118 | $ 621,682 | $ 683,851 | $ 854,813 | $ 897,554 | $ 924,480 | 952,214 |
| Insurance | $ 97,524 | $ 100,450 | $ 103,464 | $ 106,568 | $ 109,765 | $ 113,058 | 116,449 |
| Utilities | $ 539,619 | $ 601,677 | $ 664,247 | $ 695,934 | $ 710,676 | $ 728,587 | 752,405 |
| Janitorial | $ 154,107 | $ 188,596 | $ 223,471 | $ 237,515 | $ 240,504 | $ 245,459 | 254,206 |
| Repairs & maintenance | $ 120,005 | $ 137,073 | $ 154,305 | $ 162,319 | $ 165,356 | $ 169,307 | 174,985 |
| HVAC | $ 32,747 | $ 37,103 | $ 41,312 | $ 43,656 | $ 44,620 | $ 45,738 | 47,175 |
| Grounds & landscape | $ 77,993 | $ 80,333 | $ 82,742 | $ 85,226 | $ 87,782 | $ 90,415 | 93,128 |
| Refuse Removal | $ 9,001 | $ 9,272 | $ 9,550 | $ 9,836 | $ 10,131 | $ 10,435 | 10,748 |
| Elevator | $ 26,985 | $ 27,794 | $ 28,629 | $ 29,488 | $ 30,372 | $ 31,284 | 32,222 |
| Exterminating | $ 9,001 | $ 9,272 | $ 9,550 | $ 9,836 | $ 10,131 | $ 10,435 | 10,748 |
| Security and Fire | $ 22,513 | $ 23,188 | $ 23,884 | $ 24,600 | $ 25,339 | $ 26,099 | 26,882 |
| Parking Lot | $ 4,510 | $ 4,646 | $ 4,785 | $ 4,928 | $ 5,076 | $ 5,228 | 5,385 |
| Property Managment | $ 76,137 | $ 127,766 | $ 163,700 | $ 191,209 | $ 198,254 | $ 186,475 | 207,221 |
| Misc. expenses | $ 14,699 | $ 17,968 | $ 21,263 | $ 22,612 | $ 22,905 | $ 23,381 | 24,207 |
| Total Operating Expenses | $ 2,072,959 | $ 1,986,820 | $ 2,214,753 | $ 2,478,540 | $ 2,558,465 | $ 2,610,381 | $ 2,707,975 |
| | | | | | | | |
| Net Operating Income | $ 493,716 | $ 2,320,041 | $ 3,241,882 | $ 3,895,079 | $ 4,049,981 | $ 3,605,454 | $ 4,199,387 |
| | | | | | | | |
| Debt Service | $ 2,085,000 | $ 2,085,000 | $ 2,085,000 | $ 2,085,000 | $ 2,085,000 | $ 2,085,000 | $ 2,085,000 |
| | | | | | | | |
| **Leasing & Capital Costs** | | | | | | | |
| Tenant Improvements | $ 1,188,197 | $ 1,588,924 | $ 1,323,432 | $ 248,730 | $ 839,592 | $ 1,464,713 | 1,305,079 |
| Leasing Commissions | $ 427,331 | $ 527,175 | $ 555,832 | $ 159,472 | $ 361,935 | $ 669,805 | 649,388 |
| Asset Management Fees | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | 300,000 |
| Capital Improvements | $ 198,000 | $ 203,940 | $ 210,058 | $ 216,360 | $ 222,850 | $ 229,536 | 236,422 |
| Total Leasing & Capital Costs | $ 2,113,528 | $ 2,620,039 | $ 2,389,322 | $ 924,562 | $ 1,724,377 | $ 2,664,054 | $ 2,490,889 |
| | | | | | | | |
| Cash Flow | $ (3,704,812) | $ (2,384,998) | $ (1,232,440) | $ 885,517 | $ 240,604 | $ (1,143,600) | $ (376,502) |
| | | | | | | | |
| Capital and Interest Reserve | $ 4,295,188 | $ 1,910,190 | $ 677,750 | $ 1,563,267 | $ 1,803,871 | $ 660,271 | $ 283,769 |

# EXHIBIT A

## Raintree North
### 1111b Projection

| For the Years Ending | Year 1 Sep-2011 | Year 2 Sep-2012 | Year 3 Sep-2013 | Year 4 Sep-2014 | Year 5 Sep-2015 | Year 6 Sep-2016 | Year 7 Sep-2017 | Year 8 Sep-2018 | Year 9 Sep-2019 | Year 10 Sep-2020 | Year 11 Sep-2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Potential Gross Revenue** | | | | | | | | | | | |
| Base Rental Revenue | $3,130,713 | $4,282,229 | $5,573,426 | $5,719,151 | $5,869,186 | $6,645,077 | $7,221,611 | $7,582,979 | $8,126,637 | $8,360,773 | $8,535,180 |
| Absorption & Turnover Vacancy | (139,721) | (137,782) | (276,169) | (132,840) | (296,722) | (401,863) | (370,568) | (255,650) | (446,658) | (136,619) | (355,379) |
| Base Rent Abatements | (667,972) | (566,071) | (630,786) | (243,164) | (300,361) | (1,042,375) | (753,912) | (609,409) | (912,746) | (329,368) | (402,802) |
| Scheduled Base Rental Revenue | $2,323,020 | $3,578,376 | $4,666,491 | $5,343,147 | $5,272,103 | $5,200,839 | $6,097,131 | $6,717,920 | $6,767,233 | $7,892,786 | $7,776,999 |
| Base Rental Step Revenue | $41,034 | $478,383 | $544,184 | $655,345 | $781,464 | $491,782 | $299,050 | $309,112 | $287,417 | $401,874 | $525,288 |
| **Expense Reimbursement Revenue** | | | | | | | | | | | |
| Real estate taxes | $953 | $10 | $19,571 | $71,241 | $95,959 | $80,308 | $67,786 | $66,263 | $85,834 | $75,810 | $86,913 |
| Insurance | $77 | $8 | $2,827 | $8,973 | $11,775 | $9,780 | $8,249 | $8,085 | $6,847 | $9,312 | $10,658 |
| Utilities | $515 | $5 | $18,262 | $58,480 | $76,751 | $64,101 | $54,220 | $52,753 | $44,359 | $60,468 | $69,251 |
| Janitorial | $167 | $2 | $4,295 | $20,036 | $26,159 | $21,609 | $18,262 | $17,856 | $15,173 | $20,854 | $23,751 |
| Repairs & maintenance | $118 | $1 | $6,338 | $13,667 | $17,895 | $14,871 | $12,574 | $12,263 | $10,361 | $14,166 | $16,191 |
| HVAC | $40 | $1 | $1,039 | $3,598 | $4,815 | $4,229 | $3,627 | $3,387 | $2,686 | $3,590 | $4,207 |
| Grounds & landscape | $65 | $- | $2,217 | $7,141 | $9,410 | $7,913 | $6,692 | $6,501 | $5,438 | $7,359 | $8,459 |
| Refuse Removal | $7 | $- | $261 | $823 | $1,089 | $906 | $766 | $747 | $631 | $854 | $980 |
| Elevator | $24 | $1 | $743 | $2,456 | $3,253 | $2,785 | $2,366 | $2,262 | $1,862 | $2,505 | $2,895 |
| Exterminating | $16 | $- | $261 | $823 | $1,089 | $906 | $766 | $747 | $631 | $854 | $980 |
| Security and Fire | $16 | $- | $663 | $2,078 | $2,718 | $2,234 | $1,880 | $1,856 | $1,593 | $2,174 | $2,478 |
| Parking Lot | $3 | $- | $145 | $425 | $545 | $419 | $348 | $360 | $329 | $465 | $515 |
| Property Management | $84 | $1 | $4,790 | $16,345 | $21,070 | $16,344 | $14,627 | $14,829 | $12,827 | $18,998 | $20,744 |
| Misc. expenses | $16 | $- | $601 | $1,903 | $2,466 | $2,066 | $1,751 | $1,701 | $1,439 | $1,973 | $2,258 |
| Total Reimbursement Revenue | $2,052 | $26 | $62,013 | $207,988 | $275,023 | $229,071 | $193,914 | $189,610 | $160,010 | $219,382 | $250,280 |
| Rooftop | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 |
| Utility Reimb. | $12,000 | $12,120 | $12,241 | $12,364 | $12,487 | $12,612 | $12,738 | $12,866 | $12,994 | $13,124 | $13,255 |
| Other | $7,200 | $7,344 | $7,491 | | | | | | | | |
| Parking Revenue | $156,129 | $205,412 | $254,005 | $270,533 | $269,883 | $271,961 | $279,329 | $289,884 | $289,594 | $306,110 | $305,031 |
| Total | $200,529 | $250,076 | $298,937 | $308,097 | $307,570 | $309,773 | $317,267 | $327,950 | $327,788 | $344,434 | $343,486 |
| Total Potential Gross Revenue | $2,566,675 | $4,306,861 | $5,571,625 | $6,514,578 | $6,636,160 | $6,231,465 | $6,907,362 | $7,544,592 | $7,542,448 | $8,858,476 | $8,896,053 |
| General Vacancy | 0 | 0 | (114,990) | (140,959) | (27,714) | (15,630) | | (119,994) | (3,542) | (262,951) | (70,820) |
| Effective Gross Revenue | 2,566,675 | 4,306,861 | 5,456,635 | 6,373,619 | 6,608,446 | 6,215,835 | 6,907,362 | 7,424,598 | 7,538,906 | 8,595,525 | 8,825,233 |
| **Operating Expenses** | | | | | | | | | | | |
| Real estate taxes | $888,118 | $621,682 | $683,851 | $854,813 | $897,554 | $924,480 | $952,214 | $980,781 | $1,010,204 | $1,040,511 | $1,071,726 |
| Insurance | 97,524 | 100,450 | 103,464 | 106,568 | 109,765 | 113,058 | 116,449 | 119,943 | 123,541 | 127,247 | 131,064 |
| Utilities | 539,619 | 601,677 | 664,247 | 695,934 | 710,676 | 728,567 | 752,405 | 780,167 | 797,096 | 832,555 | 849,780 |
| Janitorial | 154,107 | 188,596 | 223,471 | 237,515 | 240,504 | 245,459 | 254,206 | 265,304 | 269,043 | 284,582 | 287,944 |
| Repairs & maintenance | 120,055 | 137,073 | 154,305 | 162,319 | 165,356 | 169,307 | 174,985 | 181,778 | 185,330 | 194,268 | 197,793 |
| HVAC | 32,747 | 37,103 | 41,312 | 43,656 | 44,620 | 45,738 | 47,175 | 48,902 | 49,895 | 52,279 | 53,374 |
| Grounds & landscape | 77,993 | 80,333 | 82,742 | 85,226 | 87,782 | 90,415 | 93,128 | 95,922 | 98,799 | 101,763 | 104,817 |
| Refuse Removal | 9,001 | 9,272 | 9,550 | 9,836 | 10,131 | 10,435 | 10,748 | 11,071 | 11,403 | 11,745 | 12,097 |
| Elevator | 26,985 | 27,794 | 28,628 | 29,488 | 30,372 | 31,284 | 32,222 | 33,188 | 34,184 | 35,210 | 36,266 |
| Exterminating | 9,001 | 9,272 | 9,550 | 9,836 | 10,131 | 10,435 | 10,748 | 11,071 | 11,403 | 11,745 | 12,097 |
| Security and Fire | 22,513 | 23,188 | 23,884 | 24,600 | 25,339 | 26,099 | 26,882 | 27,688 | 28,519 | 29,374 | 30,256 |
| Parking Lot | 4,510 | 4,646 | 4,785 | 4,928 | 5,076 | 5,228 | 5,385 | 5,547 | 5,714 | 5,884 | 6,062 |
| Property Management | 76,137 | 127,766 | 163,700 | 191,209 | 198,254 | 186,475 | 207,221 | 222,738 | 226,167 | 257,866 | 264,757 |
| Misc. expenses | 14,699 | 17,968 | 21,263 | 22,612 | 22,905 | 23,381 | 24,207 | 25,258 | 25,616 | 27,094 | 27,423 |
| Total Operating Expenses | $2,072,959 | $1,986,820 | $2,214,753 | $2,478,540 | $2,558,465 | $2,610,381 | $2,707,975 | $2,809,358 | $2,876,914 | $3,012,123 | $3,085,456 |
| Net Operating Income | $493,716 | $2,320,041 | $3,241,882 | $3,895,079 | $4,049,981 | $3,605,454 | $4,199,387 | $4,615,240 | $4,661,992 | $5,583,402 | $5,739,777 |

# EXHIBIT B

| For the Years Ending | Year 1 Sep-2011 | Year 2 Sep-2012 | Year 3 Sep-2013 | Year 4 Sep-2014 | Year 5 Sep-2015 | Year 6 Sep-2016 | Year 7 Sep-2017 | Year 8 Sep-2018 | Year 9 Sep-2019 | Year 10 Sep-2020 | Year 11 Sep-2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Debt Service | $ 1,515,000 | $ 1,695,000 | $ 1,875,000 | $ 2,055,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,415,000 |
| | | | | | | | | | | | |
| Leasing & Capital Costs | | | | | | | | | | | |
| Tenant Improvements | $ 1,188,197 | $ 1,588,924 | $ 1,323,432 | $ 248,730 | $ 839,592 | $ 1,464,713 | $ 1,305,079 | $ 796,746 | $ 1,248,159 | $ 345,667 | $ 515,617 |
| Leasing Commissions | $ 427,331 | $ 527,175 | $ 555,832 | $ 159,472 | $ 361,935 | $ 668,805 | $ 649,388 | $ 425,635 | $ 657,550 | $ 197,601 | $ 289,357 |
| Asset Management Fees | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 |
| Capital Improvements | $ 198,000 | $ 203,940 | $ 210,058 | $ 216,360 | $ 222,850 | $ 229,536 | $ 236,422 | $ 243,516 | $ 250,820 | $ 258,346 | $ 266,096 |
| Total Leasing & Capital Costs | $ 2,113,528 | $ 2,620,039 | $ 2,389,322 | $ 924,562 | $ 1,724,377 | $ 2,664,054 | $ 2,490,889 | $ 1,765,897 | $ 2,456,529 | $ 1,101,614 | $ 1,371,070 |
| | | | | | | | | | | | |
| Cash Flow | $ (3,134,812) | $ (1,994,998) | $ (1,022,440) | $ 915,517 | $ 90,604 | $ (1,293,600) | $ (528,502) | $ 614,343 | $ (29,537) | $ 2,246,788 | $ 1,953,707 |
| | | | | | | | | | | | |
| Capital and Interest Reserve | $ 4,865,188 | $ 2,870,190 | $ 1,847,750 | $ 2,763,267 | $ 2,853,871 | $ 1,560,271 | $ 1,033,769 | $ 1,648,112 | $ 1,618,575 | $ 3,865,363 | $ 5,819,070 |
| | | | | | | | | | | | |
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 |
| Debt Service | $ 1,515,000 | $ 1,695,000 | $ 1,875,000 | $ 2,055,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,415,000 |
| 2036 Building Sale | $57,485,000 | $55,790,000 | $53,915,000 | $51,860,000 | $49,625,000 | $47,390,000 | $45,155,000 | $42,920,000 | $40,685,000 | $38,450,000 | $36,035,000 |
| $59 Million Principal | | | | | | | | | | | |
| $ (27,100,000) | $ 1,515,000 | $ 1,695,000 | $ 1,875,000 | $ 2,055,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,415,000 |
| $ (28,000,000) | $ 1,515,000 | $ 1,695,000 | $ 1,875,000 | $ 2,055,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,415,000 |
| $ (29,000,000) | $ 1,515,000 | $ 1,695,000 | $ 1,875,000 | $ 2,055,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,415,000 |
| | | | | | | | | | | | |
| Debt Service | $ 1,515,000 | $ 1,695,000 | $ 1,875,000 | $ 2,055,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,415,000 |
| 2038 Building Sale | $63,485,000 | $61,790,000 | $59,915,000 | $57,860,000 | $55,625,000 | $53,390,000 | $51,155,000 | $48,920,000 | $46,685,000 | $44,450,000 | $42,035,000 |
| $65 Million Principal | | | | | | | | | | | |
| $ (27,100,000) | $ 1,515,000 | $ 1,695,000 | $ 1,875,000 | $ 2,055,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,415,000 |
| $ (28,000,000) | $ 1,515,000 | $ 1,695,000 | $ 1,875,000 | $ 2,055,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,415,000 |
| $ (29,000,000) | $ 1,515,000 | $ 1,695,000 | $ 1,875,000 | $ 2,055,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,415,000 |
| | | | | | | | | | | | |
| Debt Service | $ 1,515,000 | $ 1,695,000 | $ 1,875,000 | $ 2,055,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,415,000 |
| 2040 Building Sale | $69,485,000 | $67,790,000 | $65,915,000 | $63,860,000 | $61,625,000 | $59,390,000 | $57,155,000 | $54,920,000 | $52,685,000 | $50,450,000 | $48,035,000 |
| $71 Million Principal | | | | | | | | | | | |
| $ (27,100,000) | $ 1,515,000 | $ 1,695,000 | $ 1,875,000 | $ 2,055,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,415,000 |
| $ (28,000,000) | $ 1,515,000 | $ 1,695,000 | $ 1,875,000 | $ 2,055,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,415,000 |
| $ (29,000,000) | $ 1,515,000 | $ 1,695,000 | $ 1,875,000 | $ 2,055,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,235,000 | $ 2,415,000 |

# Raintree North
## 111th Projection

| | Year 12 Sep-2022 | Year 13 Sep-2023 | Year 14 Sep-2024 | Year 15 Sep-2025 | Year 16 Sep-2026 | Year 17 Sep-2027 | Year 18 Sep-2028 | Year 19 Sep-2029 | Year 20 Sep-2030 | Year 21 Sep-2031 | Year 22 Sep-2032 | Year 23 Sep-2033 | Year 24 Sep-2034 | Year 25 Sep-2035 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $9,019,765 | $9,339,035 | $9,463,955 | $9,527,881 | $9,533,539 | $9,542,465 | $9,542,465 | $9,542,467 | $9,542,465 | $9,542,467 | $9,542,465 | $9,542,469 | $9,542,464 | $9,542,465 |
| | $(575,323) | $(380,658) | $(338,117) | $(228,291) | $(316,885) | $(445,787) | $(416,564) | $(433,089) | $(369,176) | $(163,779) | $(343,351) | $(509,055) | $(456,133) | $(273,331) |
| | $(1,322,331) | $(1,196,053) | $(577,465) | $(626,957) | $(485,183) | $(844,429) | $(1,094,695) | $(961,690) | $(881,262) | $(349,550) | $(357,349) | $(1,384,261) | $(911,796) | $(690,422) |
| | $7,122,131 | $7,762,324 | $8,548,373 | $8,672,633 | $8,731,471 | $8,252,249 | $8,031,207 | $8,147,688 | $8,292,027 | $9,029,138 | $8,841,765 | $7,649,153 | $8,174,535 | $8,578,712 |
| | $391,595 | $275,774 | $289,700 | $333,975 | $458,462 | $462,442 | $366,943 | $293,531 | $289,610 | $363,749 | $515,354 | $429,584 | $289,752 | $307,925 |
| | $68,619 | $59,977 | $68,618 | $79,369 | $91,711 | $89,166 | $75,585 | $65,749 | $67,679 | $96,250 | $116,900 | $88,785 | $78,300 | $89,229 |
| | $8,106 | $7,319 | $8,420 | $9,771 | $11,274 | $10,912 | $9,216 | $8,013 | $8,305 | $11,835 | $14,358 | $10,827 | $9,528 | $10,913 |
| | $55,216 | $47,858 | $54,611 | $62,962 | $72,761 | $71,284 | $60,357 | $52,400 | $53,937 | $76,743 | $92,939 | $70,790 | $62,626 | $71,129 |
| | $17,912 | $16,231 | $18,741 | $21,765 | $25,054 | $24,367 | $20,403 | $17,665 | $18,557 | $28,575 | $32,004 | $23,921 | $21,113 | $24,216 |
| | $12,384 | $11,134 | $12,778 | $14,784 | $17,050 | $16,634 | $14,024 | $12,160 | $12,625 | $18,018 | $21,774 | $16,447 | $14,531 | $16,576 |
| | $3,545 | $3,074 | $3,295 | $3,608 | $4,256 | $4,446 | $3,945 | $3,432 | $3,232 | $4,461 | $5,478 | $4,606 | $4,167 | $4,470 |
| | $6,577 | $5,885 | $6,673 | $7,664 | $8,878 | $8,706 | $7,439 | $6,472 | $6,673 | $9,309 | $11,333 | $8,733 | $7,725 | $8,730 |
| | $750 | $872 | $772 | $900 | $1,038 | $1,008 | $853 | $740 | $765 | $1,089 | $1,321 | $1,005 | $881 | $1,012 |
| | $2,318 | $2,052 | $2,285 | $2,579 | $3,005 | $3,004 | $2,604 | $2,273 | $2,243 | $3,161 | $3,849 | $3,050 | $2,721 | $3,025 |
| | $750 | $672 | $772 | $900 | $1,038 | $1,008 | $853 | $740 | $765 | $1,089 | $1,321 | $1,005 | $881 | $1,012 |
| | $1,847 | $1,681 | $1,959 | $2,301 | $2,641 | $2,525 | $2,107 | $1,837 | $1,935 | $2,778 | $3,359 | $2,480 | $2,171 | $2,521 |
| | $347 | $325 | $407 | $502 | $571 | $513 | $400 | $346 | $405 | $602 | $717 | $478 | $409 | $499 |
| | $15,172 | $13,834 | $16,042 | $18,861 | $21,667 | $19,337 | $15,706 | $13,102 | $13,424 | $20,084 | $23,377 | $16,075 | $13,599 | $15,402 |
| | $1,718 | $1,554 | $1,781 | $2,062 | $2,373 | $2,321 | $1,951 | $1,685 | $1,760 | $2,517 | $3,030 | $2,287 | $2,019 | $2,309 |
| | $191,220 | $172,268 | $197,160 | $228,028 | $263,317 | $255,213 | $215,443 | $186,614 | $192,205 | $274,501 | $331,760 | $250,489 | $220,671 | $251,043 |
| | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 |
| | $13,388 | $13,522 | $13,657 | $13,794 | $13,932 | $14,071 | $14,212 | $14,354 | $14,497 | $14,642 | $14,789 | $14,937 | $15,086 | $15,237 |
| | $302,986 | $316,671 | $324,501 | $334,950 | $338,436 | $340,446 | $348,300 | $354,039 | $364,205 | $379,820 | $380,059 | $380,711 | $390,553 | $406,334 |
| | $342,574 | $355,393 | $363,358 | $373,944 | $377,568 | $379,717 | $387,712 | $394,193 | $403,902 | $419,662 | $420,048 | $420,848 | $430,839 | $446,771 |
| | $8,047,620 | $8,565,759 | $9,398,591 | $9,608,580 | $9,830,818 | $9,349,621 | $9,001,305 | $9,022,026 | $9,157,744 | $10,087,050 | $10,108,927 | $8,750,074 | $9,124,797 | $9,584,451 |
| | $(91,718) | $(106,786) | $(160,728) | $(216,756) | $(135,533) | $(130,417) | $(17,279) | $(14,087) | $(157,169) | $(295,866) | $(115,905) | $(57,414) | 0 | $(169,271) |
| | 7,955,802 | 8,458,973 | 9,237,863 | 9,391,824 | 9,695,285 | 9,219,204 | 8,984,026 | 9,007,939 | 9,000,575 | 9,791,184 | 9,993,022 | 8,692,660 | 9,124,797 | 9,415,180 |
| | 1,103,878 | 1,136,994 | 1,171,104 | 1,206,237 | 1,242,424 | 1,279,697 | 1,318,088 | 1,357,631 | 1,398,359 | 1,440,310 | 1,483,519 | 1,528,025 | 1,573,865 | 1,621,082 |
| | 134,997 | 139,047 | 143,218 | 147,514 | 151,940 | 156,498 | 161,193 | 166,029 | 171,009 | 176,140 | 181,424 | 186,867 | 192,472 | 198,247 |
| | 867,531 | 900,650 | 929,335 | 961,736 | 986,980 | 1,011,230 | 1,042,610 | 1,073,271 | 1,108,186 | 1,151,505 | 1,177,226 | 1,204,121 | 1,242,883 | 1,290,024 |
| | 291,355 | 305,162 | 315,409 | 327,709 | 335,078 | 341,406 | 352,864 | 362,702 | 375,687 | 393,313 | 399,216 | 405,615 | 419,712 | 438,833 |
| | 54,546 | 56,367 | 58,174 | 60,332 | 61,961 | 63,603 | 65,533 | 67,320 | 69,324 | 72,295 | 73,930 | 75,599 | 77,903 | 80,879 |
| | 107,960 | 111,200 | 114,536 | 117,972 | 121,511 | 125,156 | 128,911 | 132,779 | 136,761 | 140,864 | 145,090 | 149,443 | 153,926 | 158,544 |
| | 12,460 | 12,834 | 13,219 | 13,615 | 14,024 | 14,445 | 14,878 | 15,324 | 15,783 | 16,258 | 16,745 | 17,248 | 17,765 | 18,298 |
| | 37,354 | 38,475 | 39,629 | 40,818 | 42,042 | 43,303 | 44,603 | 45,941 | 47,319 | 48,739 | 50,201 | 51,707 | 53,258 | 54,855 |
| | 12,460 | 12,834 | 13,219 | 13,615 | 14,024 | 14,445 | 14,878 | 15,324 | 15,783 | 16,258 | 16,745 | 17,248 | 17,765 | 18,298 |
| | 31,164 | 32,098 | 33,061 | 34,053 | 35,075 | 36,128 | 37,211 | 38,326 | 39,476 | 40,661 | 41,881 | 43,137 | 44,431 | 45,764 |
| | 6,243 | 6,431 | 6,623 | 6,822 | 7,027 | 7,237 | 7,454 | 7,678 | 7,908 | 8,145 | 8,390 | 8,642 | 8,901 | 9,169 |
| | 238,674 | 253,770 | 277,136 | 281,756 | 290,859 | 276,577 | 274,938 | 278,438 | 270,908 | 293,736 | 299,791 | 260,781 | 273,744 | 282,455 |
| | 27,760 | 29,050 | 31,025 | 31,199 | 33,061 | 33,982 | 33,983 | 34,847 | 35,761 | 37,447 | 38,019 | 38,636 | 38,642 | 41,779 |
| | 3,127,786 | 3,244,547 | 3,361,103 | 3,467,583 | 3,564,707 | 3,637,372 | 3,733,482 | 3,836,657 | 3,949,359 | 4,104,308 | 4,206,248 | 4,266,869 | 4,405,607 | 4,558,830 |
| | 4,828,006 | 5,214,426 | 5,876,760 | 5,924,235 | 6,130,578 | 5,581,832 | 5,250,544 | 5,171,282 | 5,051,216 | 5,686,876 | 5,786,774 | 5,425,791 | 4,719,190 | 4,856,350 |

Table columns (left to right): Year 12 (Sep-2022) through Year 25 (Sep-2035), with IRR at right.

| | Year 12 Sep-2022 | Year 13 Sep-2023 | Year 14 Sep-2024 | Year 15 Sep-2025 | Year 16 Sep-2026 | Year 17 Sep-2027 | Year 18 Sep-2028 | Year 19 Sep-2029 | Year 20 Sep-2030 | Year 21 Sep-2031 | Year 22 Sep-2032 | Year 23 Sep-2033 | Year 24 Sep-2034 | Year 25 Sep-2035 | IRR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $ 2,415,000 | $ 2,415,000 | $ 2,415,000 | $ 2,415,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | |
| | $ 2,537,667 | $ 1,134,585 | $ 891,204 | $ 684,206 | $ 940,061 | $ 1,886,208 | $ 1,281,213 | $ 1,484,881 | $ 1,652,659 | $ 481,489 | $ 969,725 | $ 2,422,234 | $ 2,086,984 | $ 1,253,940 | |
| | $ 1,308,913 | $ 580,871 | $ 471,590 | $ 346,106 | $ 424,206 | $ 853,309 | $ 573,307 | $ 641,142 | $ 703,532 | $ 216,600 | $ 380,276 | $ 902,354 | $ 780,283 | $ 469,025 | |
| | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | |
| | $ 274,078 | $ 282,300 | $ 290,770 | $ 299,492 | $ 308,478 | $ 317,732 | $ 327,264 | $ 337,082 | $ 347,194 | $ 357,610 | $ 368,338 | $ 379,388 | $ 390,770 | $ 402,484 | |
| | $ 4,420,658 | $ 2,307,756 | $ 1,953,564 | $ 1,629,804 | $ 1,972,745 | $ 3,357,249 | $ 2,481,784 | $ 2,763,105 | $ 3,003,385 | $ 1,355,699 | $ 2,018,339 | $ 4,003,976 | $ 3,558,037 | $ 2,425,459 | |
| | $ (2,007,652) | $ 491,670 | $ 1,508,196 | $ 1,562,813 | $ 1,562,813 | $ (370,417) | $ 173,760 | $ (186,823) | $ (547,169) | $ 1,736,177 | $ 1,173,435 | $ (2,173,185) | $ (1,433,847) | $ (164,109) | |
| | $ 3,811,418 | $ 4,303,088 | $ 5,811,284 | $ 7,690,715 | $ 9,253,528 | $ 8,883,111 | $ 9,056,871 | $ 8,870,048 | $ 8,322,879 | $ 10,059,056 | $ 11,232,491 | $ 9,059,306 | $ 7,625,459 | $ 7,461,350 | 6.52%<br>6.09%<br>5.86% |
| | Year 12 | Year 13 | Year 14 | Year 15 | Year 16 | Year 17 | Year 18 | Year 19 | Year 20 | Year 21 | Year 22 | Year 23 | Year 24 | Year 25 | |
| | $ 2,415,000 | $ 2,415,000 | $ 2,415,000 | $ 2,415,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | |
| | $33,620,000 | $31,205,000 | $28,790,000 | $26,375,000 | $23,780,000 | $21,185,000 | $18,590,000 | $15,995,000 | $13,400,000 | $10,805,000 | $ 8,210,000 | $ 5,615,000 | $ 3,020,000 | $ 425,000 | |
| | $ 2,415,000 | $ 2,415,000 | $ 2,415,000 | $ 2,415,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 3,020,000 | |
| | $ 2,415,000 | $ 2,415,000 | $ 2,415,000 | $ 2,415,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 3,020,000 | |
| | $ 2,415,000 | $ 2,415,000 | $ 2,415,000 | $ 2,415,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 3,020,000 | |
| | $39,620,000 | $37,205,000 | $34,790,000 | $32,375,000 | $29,790,000 | $27,185,000 | $24,590,000 | $21,995,000 | $19,400,000 | $16,805,000 | $14,210,000 | $11,615,000 | $ 9,020,000 | $ 6,425,000 | 6.95%<br>6.64%<br>6.31% |
| | Year 12 | Year 13 | Year 14 | Year 15 | Year 16 | Year 17 | Year 18 | Year 19 | Year 20 | Year 21 | Year 22 | Year 23 | Year 24 | Year 25 | |
| | $ 2,415,000 | $ 2,415,000 | $ 2,415,000 | $ 2,415,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | |
| | $45,620,000 | $43,205,000 | $40,790,000 | $38,375,000 | $35,780,000 | $33,185,000 | $30,590,000 | $27,995,000 | $25,400,000 | $22,805,000 | $20,210,000 | $17,615,000 | $15,020,000 | $12,425,000 | |
| | $ 2,415,000 | $ 2,415,000 | $ 2,415,000 | $ 2,415,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $15,020,000 | |
| | $ 2,415,000 | $ 2,415,000 | $ 2,415,000 | $ 2,415,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $15,020,000 | |
| | $ 2,415,000 | $ 2,415,000 | $ 2,415,000 | $ 2,415,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $ 2,595,000 | $15,020,000 | 7.32%<br>7.02%<br>6.70% |

**Raintree North**
**IRR Sensitivity Analysis**

**25-Year Balloon**

|  | $59 Million | $65 Million | $71 Million |
|---|---|---|---|
| $27.1 Million | 6.52% | 6.95% | 7.32% |
| $28.0 Million | 6.20% | 6.64% | 7.02% |
| $29.0 Million | 5.86% | 6.31% | 6.70% |

# EXHIBIT C