Richard M. Lorenzen, Bar No. 006787
**PERKINS COIE BROWN & BAIN P.A.**
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
RLorenzen@perkinscoie.com
Telephone: 602.351.8000
Facsimile: 602.648.7000

Attorneys for U.S. Bank, N.A., as Trustee for
the Registered Holders of Merrill Lynch
Mortgage Trust 2006-C1, Commercial Mortgage
Pass-Through Certificates, Series 2006-C1

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>RCC NORTH, LLC,<br><br>             Debtor. | Chapter 11<br><br>Case No.: 2:10-bk-11078-SSC<br><br>**OBJECTION TO DEBTOR'S AMENDED PLAN OF REORGANIZATION**<br><br>Hearing Date: December 7, 2010<br>Hearing Time: 11:00 a.m.<br>Place:   Courtroom 701<br>           230 N. First Avenue<br>           Phoenix, AZ 85003 |

U.S. Bank, N.A., as Trustee for the Registered Holders of Merrill Lynch Mortgage Trust 2006-C1, Commercial Mortgage Pass-Through Certificates, Series 2006-C1 ("U.S. Bank"), by and through its undersigned counsel, hereby objects to confirmation of the Debtor's *Amended Plan of Reorganization* (the "Plan").

### MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

US Bank holds a claim against this estate in the amount of approximately $70,258,025 (Claim 4-1), which is secured by the Debtor's real estate and improvements, as

well as the Debtor's personal property, including cash collateral. The Debtor has failed to make any payments to US Bank on this indebtedness since prior to August 2009. Despite failing to make any of those debt service payments, property tax payments, and various operating expenses,[1] the Debtor has accumulated only approximately $469,000 during that fifteen (15) month period (DE 112). The total accrued, unpaid debt service payments, property taxes, and operating expenses for the same period far exceeds the $469,000 collected by Debtor. The monthly base rental for Building 1 has actually decreased during this bankruptcy case from approximately $142,000 per month at the beginning of the case, to approximately $133,000 at the present time.

The Plan violates numerous provisions of 11 U.S.C. § 1129(a). For example, the Plan violates the rules on classification of claims, was not proposed in good faith (including by virtue of its attempt to artificially impair classes of creditors in order to engineer an impaired class to vote in favor of the Plan), fails to provide US Bank with as much as it would receive in the event of a liquidation of the Debtor's assets, and it is not feasible.

Even if the Plan satisfied all of the requirements of § 1129(a) other than (a)(8), the Plan could not be confirmed under § 1129(b), including because it is not fair and equitable, and because it violates the absolute priority rule. In essence, the Plan provides that the Debtor's current owner (the "Owner") will retain all ownership interests in the properties, and all of the upside potential for an increase in the value of the properties, in exchange for payment of less than 2% of unsecured claims.

Although the Debtor claims that the Owner will contribute $8 million, only $500,000 of that sum will actually be used for payment of unsecured claims.[2] This $500,000 payment

---

[1] In addition to the debt service and property taxes, the Debtor failed to pay approximately $66,000 in operating expenses, and "asset management fees" of $25,000 per month to its insider manager. The Debtor also failed to provide approximately $130,000 in tenant improvements to a tenant. *See, fn 7, and accompanying text, infra*. The unsecured trade claims of approximately $66,000 are the only non-tenant, non-insider general unsecured claims in this bankruptcy apart from US Bank's massive deficiency claim. While the amount of US Bank's deficiency claim cannot be quantified until the value of the collateral has been determined, it appears that such claim will easily exceed $30 million.

[2] *Amended Disclosure Statement Relating to Amended Plan of Reorganization*, 22:18-21.

represents less than 2% of all of the unsecured claims being discharged, and pales in comparison to the potential future increase in the value of the properties for the benefit of the Debtor's Owner.[3]

The balance of the Owner's contributed funds will be used to create an interest reserve account ("Interest Reserve") of $3,000,000 for the US Bank secured claim, and a capital reserve account ("Capital Reserve") of $4,500,000 for tenant improvements, broker's commissions, and capital expenses relating to the property.[4] The unsecured creditors have no rights whatsoever to any of the funds in those accounts. To the contrary, the funds in the Interest Reserve will be used only for payment of interest on US Bank's secured claim, while the funds in the Capital Reserve are only: (a) to pay hypothetical expenses associated with hoped-for new tenants that would also increase cash flow and the value of the properties for the benefit of the Owner; (b) potential funding of the interest payments on US Bank's secured debt if the hoped-for tenants do not appear; or (c) potentially returned to the Owner..

The Debtor has not attempted to test the market for the properties, or for the ownership interests in the Debtor. Instead, the Debtor's Owner has engineered the Plan in such a way that it will be the only potential bidder for the equity in the reorganized Debtor. The Plan is not fair and equitable as to the secured or unsecured claims, and it violates the absolute priority rule.

## II. ARGUMENT

### A. The Plan Violates § 1129(a)(1).

According to § 1129(a)(1)[5], a Chapter 11 plan of reorganization can be confirmed only if "[t]he plan complies with the applicable provisions of this Title." The legislative history of § 1129(a)(1) demonstrates that the applicable provisions of the Bankruptcy Code

---

[3] Notably, the Disclosure Statement fails to even address any of these issues regarding potential future value of the properties or a comparison of the benefits to be received by the Owner as compared to the amounts received by unsecured creditors from the contribution.
[4] *Id*.
[5] Unless otherwise specified herein, "§" shall refer to a section or subsection of Title 11 United States Code (the "Bankruptcy Code").

referred to therein are those regulating the plan's internal structure and drafting:

> (1) [of § 1129(a)] requires that the plan comply with the applicable provisions of Chapter 11, such as §§ 1122 and 1123, governing classification and contents of plan.[6]

The Plan designates two separate classes of tenant-related claims as impaired, unsecured classes. First, Class 3 consists of an alleged unsecured claim of a tenant, Eye-Level Holdings, resulting from the Debtor's failure to provide approximately $130,000 in tenant improvements under the terms of the lease.[7] Second, Class 4 consists of a class of alleged unsecured claims of existing tenants for repayment of security deposits "held by the Debtor."[8]

According to the Plan, all tenant leases are expressly assumed by the Debtor as of the confirmation date.[9] As held in *In re Boston Post Road Limited Partnership*, 21 F.3d 477, 484 (2nd Cir. 1994):

> The obligations assumed by the debtor under the continued leases constitute post-petition administrative claims. *See* 11 U.S.C. § 503(b)(1)(A). Such administrative claims are defined as priority claims under 11 U.S.C. § 507(a)(1), and must be paid in full in cash pursuant to 11 U.S.C. § 1129(a)(9)(A); their holders are not entitled to vote on a plan of reorganization.[10]

Moreover, § 1123(a)(1) specifically prohibits a plan from designating administrative priority claims such as these as a class.

---

[6] S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 91977). *See, Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 512-13 n.3 (5th Cir. 1998) (presumption that section 1129(a)(1) may be used to raise objections under section 1123(a).

[7] When added to the approximately $66,000 in unpaid operating expenses, this also shows that during the fifteen (15) prior months, the Debtor has actually only been able to generate approximately $269,000 in excess of operating expenses, exclusive of the unpaid Cavan asset management fee of $300,000 per year, debt service payments, and property taxes. If the asset management fees are included, the Debtor has operated at a negative cash flow during that fifteen (15) month period, with no debt service or property tax payments.

[8] Disclosure Statement, 10:25-26. In fact, the Debtor has made no showing that it is "holding" any security deposits in a segregated account, and, upon information and belief, the Debtor has simply used any security deposits from its tenants for payment of operating or other expenses.

[9] Disclosure Statement, 32:13-15.

[10] *See also, In re Cochise College Park, Inc.*, 703 F.2d 1339, 1352 (9th Cir. 1983) ("Until rejection, however, the executory contract continues in effect and the non-bankrupt party to the executory contract is not a creditor with a provable claim against the bankruptcy estate.") Even if the Debtor rejected one or more leases, the resulting claims would simply be unsecured claims in Class 5, pursuant to §§ 365(g) and 502(g).

Even if the claims in Classes 3 and 4 were general unsecured claims entitled to vote, which they are not, the separate classification of these claims would be impermissible as an improper attempt at separate classification for the purpose of securing an impaired consenting class under § 1129(a)(10).[11] Since such unsecured claims would exist only if the leases were rejected, there would be no legitimate basis for separate classification of such claims even it they did exist.

In addition, the Plan proposes to pay the alleged unsecured claims in Classes 3 and 4 in full; while the unsecured claims in Class 5 will receive only pennies on the dollar, if that. If the Debtor rejected the leases of these tenants in order to create actual unsecured, pre-petition claims, there would be no justification for this disparate treatment.[12] The only basis for this superior treatment of the tenant claims is the fact that the leases are being assumed, which means both that these creditors hold administrative priority claims, and that they are not entitled to vote. For these reasons, the Plan violates §§ 1122 and 1123, and the attempt to create such alleged impaired classes in order to satisfy § 1129(a)(10) is improper.

### B. The Plan Violates § 1129(a)(3).

The Plan improperly seeks to create classes of "impaired" secured creditors to satisfy the requirements of § 1129(a)(10), through the artificial impairment of the claims of the Debtor's professionals; the law firm of Fennemore Craig (Class 2-C) and the accounting firm of Larson Allen (Class 2-D). According to the Disclosure Statement, Fennemore Craig has a claim of $26,439 secured by a cash retainer in the amount of $30,000, while Larson Allen has a claim of $3,941.56 secured by a cash retainer in the amount of $25,000.[13] The Plan proposes to "impair" Fennemore Craig by paying the full amount of its claim plus interest at 5.95% from the retainer, even though the retention agreement does not provide for the

---

[11] *In re Ambanc La Mesa Limited Partnership*, 115 F.3d 650, 656-57 (9th Cir. 1997), citing *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991), *cert. denied*, 506 U.S. 821, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992), and *cert. denied*, 506 U.S. 822, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992).

[12] The different treatment of unsecured claims would also be unfairly discriminatory for purposes of § 1129(b) under those circumstances.

[13] Disclosure Statement, 8:7-12.

payment of interest. The Plan proposes to "impair" Larson Allen by paying the full amount of the its claim plus interest at 5.95% per year from retainer, rather than the 1.5% per month called for under the retention agreement.[14] Assuming 6 months of interest, what this means is that Larson Allen will receive $117.26 in interest, rather than the $354.74 it is allegedly entitled to (a difference of $237.48), while Fennemore Craig will receive a bonus payment of approximately $786.56.[15] Thus, by paying Fennemore Craig $786.56 to which it might not otherwise be entitled, and by reducing Larson Allen's payment by $237.48 (a net cost to the Debtor of $549.08), the Debtor contends that it will thereby acquire the right to involuntarily cram down US Bank's deficiency claim of more than $30,000,000. The inequity of such a result is undeniable.

Many courts have prohibited this type of artificial impairment by interpreting "impairment" to exclude such attempts to "artificially" impair a class.[16] The Ninth Circuit, however, has approached the issue from a different perspective; holding that the concept of "impairment" is very broad, and that the focus of the inquiry should not be on the definition of "impairment", but rather on the fact that a plan is not filed in good faith, and hence does not satisfy the requirements of § 1129(a)(3), if the plan proponent manufactured the impairment "solely to create an impaired class to vote in favor of the Plan, and thus 'cram down' the other impaired classes."[17] As held in *In re Hotel Associates of Tucson*, 165 B.R.

---

[14] Disclosure Statement, 17:12-15.

[15] The Debtor should also be required to disclose copies of the underlying retention agreements, and to disclose whether Fennemore Craig and Larson Allen have agreed in advance to theses terms, since such an agreement could mean that the Plan does not even arguably alter those parties' rights.

[16] *See, for example, In re Combustion Engineering, Inc.,* 391 F.3d 190, 243 (3rd Cir. 2005):

> "Artificial" impairment occurs when a plan imposes an insignificant or *de minimis* impairment on a class of claims to qualify those claims as impaired under § 1124. The chief concern with such conduct is that it potentially allows a debtor to manipulate the Chapter 11 confirmation process by engineering literal compliance with the Code while avoiding opposition to reorganization by truly impaired creditors.

[17] *In re L&J Anaheim Associates*, 995 F.2d 940, 943 (9th Cir. 1993), quoting *In re Club Associates*, 107 B.R. 385, 401 (Bankr. N.D. Ga. 1989) ("An alteration which is clearly intended only to create an impaired class to vote in favor of a plan so that a debtor can effectuate a cram down . . . will not be allowed.").

470, 475-76 (9th Cir. B.A.P. 1994): "On remand the court should recognize that the act of impairment in an attempt to gerrymander a voting class of creditors is indicative of bad faith." Other courts have similarly recognized that this type of gerrymandering of impairment by a plan proponent to manufacture an impaired class solely for the purpose of satisfying § 1129(a)(10), will not be permitted, whether viewed as "artificial" impairment, or as lacking in good faith.[18]

Under the facts disclosed in the Disclosure Statement, the only conceivable conclusion is that the proposed treatment of Fennemore Craig and Larson Allen under the Plan renders the Plan unconfirmable, because it was not filed in good faith. The "impairment" of these creditors was manufactured solely and exclusively by the Debtor's principals to create an impaired class for voting purposes, in order to facially satisfy the requirements of § 1129(a)(10), and attempt to involuntarily cram down US Bank's deficiency claim of more than $30,000,000. There can be no doubt about it. The cash is not only available to pay these creditors in accordance with the terms of their agreements, but the cash is actually being held by those creditors as security for the claims. There is no legitimate reason why the Debtor could not provide for payment of those claims without alteration, nor any reason why the secured creditors could not demand and receive such treatment. Moreover, the extent of the impairment is laughable. Fennemore Craig is actually being impaired by receiving $786.56 in interest to which it would not otherwise be entitled, while Larson Allen is arguably relinquishing only $237.48 to accommodate a client that will presumably need further accounting work in the future.[19]

C. **The Plan Violates § 1129(a)(7)(A).**

The Plan proposes to limit US Bank's secured claim to only $27,100,000, which the

---

[18] *In re Woolley's Parkway Center, Inc.,* 174 B.R. 996, 103 (N.Fla. 1992); *In re Meadow Glen, Ltd.*, 87 B.R. 421, 427 (W.Tex. 1988); *In re Windsor on the River Ass., Ltd*., 7 F.3d 127, 131 (8th Cir. 1993).

[19] Finally, the Debtor may be attempting to create one last impaired class in the form of an alleged secured property tax claim in favor of Maricopa County (Class 2-B). This is simply illusory, since there are no unpaid property taxes. US Bank has been required to advance money to pay those property taxes because the Debtor failed to make the payments, and the Debtor's Schedule D (Creditors Secured Claims) does not list any such secured property tax claim.

Debtor alleges to be the value of the real estate and improvements constituting US Bank's collateral.[20] The Plan doesn't include any value for the remainder of US Bank's collateral, such as approximately $2 million in cash collateral, approximately $1 million in accounts receivable, and approximately $411,000 in personal property. Accordingly, the Plan violates the provisions of § 1129(a)(7)(A)(ii), because US Bank is not receiving as much as it would receive if the Debtor were liquidated. If the Debtor was able to seek cram down under § 1129(b), this would also mean that the Plan violates § 1129(b)(2)(A)(i)(II). *Ambanc, supra.*, at 653-54.

### D. The Plan Violates § 1129(a)(11).

The Plan is predicated upon unsubstantiated assumptions of massive, short-term increases in revenue, and significant reductions in expenses such as property taxes.[21] According to the Plan Projections, during the first year of operations (ending September, 2011), the reorganized Debtor will generate net operating income of $493,716, resulting in a negative cash flow for the year of $3,704,812, thereby wiping out roughly half of the Interest Reserve and the Capital Reserve. But wait; help is just around the corner! According to the Plan Projections, the net operating income for the second year of operations will increase by an astounding 470% to $2,320,041, and will then increase by another 40% above that figure in the third year of operations. There is no legitimate support for these wild assumptions. This Debtor has been operating at a loss during the last fifteen (15) months without even paying any debt service or its property taxes. Revenues on Building 1 of the project have actually declined during this bankruptcy case. No fewer than 9 of the Debtor's leases at the property expire in 2011.

The negative cash flow projected in the Plan Projections could be reduced if new tenants are not found and the related expenditures for tenant improvements and leasing commissions are not made. However, without those new tenants and related expenditures

---

[20] US Bank does not concede that this is an accurate value for the real estate and improvements for purposes of plan confirmation, and is in the process of obtaining more current valuation information.
[21] Disclosure Statement, Exhibit A (the "Plan Projections").

the Interest Reserve will be exhausted within the first two years of operations, whereupon the funds in the Capital Reserve will have to be used to cover debt service on the secured debt, and the Debtor won't have the funds that it claims are necessary in order to attract new tenants. In the alternative, the Debtor might simply stop making the debt service payments, and return the contents of the Interest Reserve and the Capital Reserve to the Owner.

The Plan Projections are also unrealistic because they assume the payment of debt service to US Bank on only $27,100,000 in debt. As set forth above, the actual amount of US Bank's secured claim is significantly greater than $27,100,000, and the corresponding debt service payments on the actual amount of the secured debt will need to be correspondingly increased.

The Plan offers the unsecured creditors an unsecured, potentially non-recourse note in the form of a "subordinated debenture" for $5 million that is secured by a junior lien on the property (the "Hope Note").[22] The Hope Note accrues no interest, becomes payable in seven (7) years, and may be non-recourse. According to the Plan Projections, if everything goes according to plan, then, at the end of the seventh year, the Debtor will have amassed a grand total of $283,769. There are no funds even projected to be available for payment of the Hope Note when it becomes due, even though, according to the Plan Projections, the net operating income for the property will have increased from $493,716 in the first year to $4,199,387 in year seven.

The Plan also fails to take into account the fact that an affiliate of the Debtor owns a comparable office complex ("RCC South"), that is adjacent to the properties owned by this Debtor. RCC South is managed by the same Cavan insider management company that manages RCC North, and RCC South competes directly with RCC North for tenants, presumably including tenants of RCC North such as those whose leases will expire in 2011. RCC South is also a debtor in a Chapter 11 bankruptcy case, and is in need of finding new tenants. There are no operational or other controls to resolve the obvious conflict of interest

---

[22] Disclosure Statement, 21:5-13.

created by this situation, or any basis upon which to conclude that RCC North will market its buildings to tenants as competitively under Cavan management as it would under independent, non-conflicted management.

The Plan is not feasible. It is part and parcel of an effort by the Debtor's Owner to use this bankruptcy to discharge tens of millions of dollars of debt, so that, with little or no risk, the Owner may attempt to reap all of the benefits of the projected, enormous increases in cash flow and hoped-for increases in real property values and other benefits.

### E. Cram Down is Not Permissible in This Case.

The Debtor cannot even attempt to seek confirmation of the Plan through cram down under § 1129(b), because the Plan does not satisfy all of the requirements of § 1129(a) other than (a)(8). Even if the Plan did comply with those requirements of § 1129(a), confirmation under § 1129(b) would be impermissible both as to the US Bank secured claim (§ 1129(b)(2)(A)(ii)(II)), and as to the unsecured claims (§ 1129(b)(1), and (2)(B)(ii)).

#### 1. US Bank's Secured Claim.

Section 1129(b)(1) sets forth the general proposition that a plan of reorganization may be confirmed provided that it satisfies all requirements of § 1129(a) other than paragraph (8), "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." The Bankruptcy Code does not define fair and equitable, but enumerates certain requirements that must be met under any circumstances. The relevant, enumerated requirement for purposes of the US Bank secured claim is § 1129(b)(2)(A)(i)(II), which requires:

> That each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property. . . .

The Plan does not satisfy this requirement with regard to the valuation of the secured claim, both because: (a) the value of the real estate and improvements has not yet been

determined; and (b) the Plan doesn't even attempt to account for all of US Bank's other collateral. *Ambanc, supra.* In addition, the Plan fails to satisfy this requirement because the proposed interest rate payable to US Bank is less than a market rate of interest, taking into account the risk associated with this proposed transaction and the circumstances of the Debtor.

### 2. Unsecured Claims.

The relevant, enumerated statutory requirement for unsecured claims is § 1129(b)(2)(B)(ii), which requires that:

> [T]he holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property. . . .

Under this "absolute priority rule" a bankruptcy court may not approve a plan of reorganization that gives existing interest holders any interest in the reorganized estate unless the plan provides for full payment of claims of creditors in the objecting class. *Ambanc, supra.*; *In re Perez*, 30 F.3d 1209 (9th Cir. 1994).

Since the Plan clearly provides for retention by the Owner of its ownership interests in the Debtor without payment in full (or even a significant percentage) of unsecured claims, the Debtor must prove that the Plan satisfies the new value "exception" or "corollary" to the absolute priority rule. At a minimum this requires the Debtor to prove that its Owner will contribute value under the Plan that is:

> (1) new, (2) substantial, (3) in money or money's worth, (4) necessary for successful reorganization, and (5) reasonably equivalent to the value or interest received.[23]

Since this issue arises within the context of the determination of whether the Plan is fair and equitable as to an objecting class of unsecured creditors, the focus of this inquiry must be from the perspective of the unsecured creditors who are objecting. From that perspective, the only new, up front money being offered to the unsecured creditors is

---

[23] *Ambanc, supra.*, at 654.

$500,000, which is less than 2% of the unsecured claims.[24] All of the other amounts being contributed go exclusively to service secured debt, and for payment of expenses that will correspondingly increase the Owner's profits. In addition, the Disclosure Statement and the Plan have no restrictions on the Owner's ability to withdraw those funds following confirmation.

In cases such as this where the dividend being paid on unsecured claims by virtue of the contribution is *de minimis*, the courts have uniformly held, as a matter of law, that such contributions are insufficient to satisfy the new value exception, without a need to evaluate the remaining factors. *Ambanc, supra.*, at 655; *In re Woodbrook Assocs.*, 19 F.3d 312, 320 (7th Cir. 1994) (3.8% of $2.6 million unsecured debt is not substantial); *In re Snyder*, 967 F.2d 1126, 1132 (7th Cir. 1992) (contribution of 2.2% of unsecured claims was "so extreme . . . there [was] no need to proceed any further. . . ."); *In re Olson*, 80 B.R. 935 (Bankr. C.D. Ill. 1987) (1.56% on unsecured held insubstantial).

As held in *Ambanc, supra*, at 656 (citations omitted):

> Rejection of *de minimis* contributions is consistent with long standing precedent. The absolute priority rule arose in the early part of this century from litigation attacking collusion between shareholders and bondholders who sought to squeeze out unsecured creditors and reorganizations of failed railroads. The courts initially employed fraudulent transfer principles to assist unsecured creditors. In one early such case, the Supreme Court recognized two general principles: First, continued shareholder participation in the reorganized debtor creates a presumption of collusion. Second, reorganization managers could dispel this presumption by promulgating a "fair" offer to all creditors.

The presumption of collusion and unfairness is particularly powerful in this case, given the lack of any significant unsecured creditors other than US Bank. The Plan is a transparent attempt by the Owner to wipe out over $30 million of unsecured debt held by US Bank, while contributing just enough to hold US Bank at bay from foreclosing on its secured claim,

---

[24] The potential, future payment under the non-recourse Hope Note does not qualify as a present, up front payment of money, which is required to satisfy this test.

so that the passage of time and leasing efforts may enhance the revenues and value of the properties for the benefit of the Owner.

Under the "money or money's worth" requirement, new capital contributed by equity holders: "(1) must consist of money or property which is freely traded in the economy, and (2) must be a present contribution taking place on the effective date of the plan rather than a future contribution."[25] In this case, it is not clear that the sums to be contributed by the Owner, other than the $500,000 payment to unsecured creditors, represent a present contribution, since $4.5 million of the contribution is to be placed in the Capital Reserve and used only for limited purposes such as tenant improvements and capital expenses that may never occur. The Debtor's ability to use those funds is entirely dependent upon uncertain, future events. In addition, there has been no showing as to whether there are any restrictions whatsoever on the Owner's ability to recover the funds in the Interest Reserve or the Capital Reserve post-petition, and there has been no showing that the Debtor's unsecured creditors will be able to reach any of those funds under any circumstances. The Debtor should also be required to disclose the terms of all agreements or understandings with the parties providing the funds for the contribution, to enable the Court and creditors to evaluate any limitations on the Debtor's ability to use those funds, any requirements for return or repayment of those funds, and any other relevant matters.

In a closely held company such as this, the Court should also consider whether the Debtor and its Owner are making their "best efforts" to pay their creditors. *In re Haskell Dawes, Inc.*, 199 B.R. 867, 875 (Bankr. E.D. Pa. 1996); *In re Capital Center Equities*, 144 B.R. 262, 268 (Bankr. E.D. Pa. 1992). In this case, it is apparent only that the Owner is making its best efforts to wipe out tens of millions of dollars in unsecured debt while retaining as much as possible of the future upside potential of the property, while paying less than 2% on unsecured claims. The fact that the Owner contends that it is prepared to participate in an auction further demonstrates that the initial proposed contribution is not its

---

[25] *Ambanc, supra.,* at 655.

best effort to repay creditors.

The Debtor has not even attempted to demonstrate that the proposed contribution by the Owner is "reasonably equivalent to the value or interest received."[26] This omission is particularly glaring, since it is the Debtor's burden of proving that all of these elements have been satisfied. Although the Ninth Circuit has not yet articulated a precise test for measurement of this element,[27] and while the Debtor has not even suggested the appropriate methodology to be used in this regard, US Bank contends that any such valuation must take into account not only the potential future upside potential of the reorganized Debtor, but also any and all other benefits or value inuring to the Owner or its principals.[28] It is apparent that such other benefits in this case would include, at a minimum, any tax benefits, as well as the asset management fees of $300,000 per year, and the property management fees that steadily increase over the period of the Plan Projections to an annual amount in excess of $200,000.

In order to satisfy this valuation requirement, the Debtor must also market the equity interests in the reorganized Debtor and allow other potential bidders to participate in an auction for those equity interests. As held in *Bank of America Nat'l Trust and Savings Assn*

---

[26] *Ambanc, supra.,* at 654.

[27] *Ambanc, supra.*, at 655 ("The present case still does not present us with the factual situation appropriate for the resolution of the difficult issues of the valuation in the context of the new value corollary."); *In re Bonner Mall Partnership*, 2 F.3d 899, 917 n.40 (9th Cir. 1993) ("[W]e shall not address valuation methodology at this juncture.").

[28] *See e.g., In Re Beaver Office Products, Inc.*, 185 B.R. 537, 544-545 (Bankr. N.D. Ohio 1995) (calculation of "value to be received by equity holders in exchange for their contribution must include consideration of salaries which they receive from Debtor, releases to be obtained by Debtor in their favor and Debtor's payment of bank's secured claim under plan since equity investors were directly liable for such obligation); *In re BMW Group 1, Ltd.,* 168 B.R. 731, 741 (Bankr. W.D. Okla. 1994) (where "owner of business also personally owns the building which is leased to the business at favorable rates," company may be worth more in hands of owner "than in the hands of anyone else"); *In re SM 104 Ltd.,* 160 B.R. at 228-230 (although benefits, such as ability to control reorganized debtor and opportunity to be paid a salary for managing the reorganized debtor, cannot be valued by the capitalization of future earnings approach, they may have value to the equity holders that should be considered in determining whether the "new value infusion is reasonably equivalent to any quantifiable value being received the purchaser of the equity"); *In re Creekside Landing, Ltd.*, 140 B.R. at 718 (benefits that are personal to an investor such as tax benefits, plan payments that release the investor from liability, and dividends, distributions or even a future salary from the debtor, bear on the value received by that investor); *In re Pullman Construction Industries, Inc.*, 107 B.R. 909, 949 (Bankr. N.D. Ill, 1989) (considering retention of ownership and control of company, potential tax benefits, potential future profits, release from personal liability and salaries provided to family members in determining whether contribution was reasonably equivalent to interest being retained).

*v. 203 N. LaSalle Street Partnership*, 526 U.S. 434, 457-58, 119 S.Ct. 1411, 1423-24 (1999):

> In the interest of statutory coherence, a like disfavor for decisions untested by competitive choice ought to extend to valuations in administering subsection (b)(2)(B)(ii) when some form of market valuation may be available to test the adequacy of an old equity holder's proposed contribution.
>
> Whether a market test would require an opportunity to offer competing plans or would be satisfied by a right to bid for the same interest sought by old equity is a question we do not decide here. It is enough to say, assuming a new value corollary, that plans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii).

In this case, the Debtor is attempting to straddle the fence on this issue. The Plan is framed as providing an exclusive opportunity for Owner to acquire the equity interests of the reorganized Debtor. It then states that other interested parties might bid for the equity interests, but only in accordance with specified conditions, and only if the Court "determines that, under the circumstances, the New Value to be contributed by RCCH is insufficient, or that other parties-in-interest should be allowed to bid for the equity interests in the reorganized Debtor. . . ."[29] One of the conditions for another party to make a bid under the Plan is that the potential bidder must have deposited $1 million in cash with Debtor's counsel at least twenty-five (25) days prior to the confirmation hearing.[30] This condition is unfair and inequitable, both because it is not a condition imposed upon the Owner (which has admitted that it is presently unable to fund the acquisition of the equity interests), and because it effectively eliminates any semblance of a real market for the equity interests by requiring a potential bidder to post $1 million and satisfy other requirements before the Court has even determined that other bids will be permitted. Moreover, there is no evidence that the equity interests have been given any exposure to a reasonable market. To the contrary,

---

[29] Disclosure Statement, 19:12-14.
[30] Disclosure Statement, 19:24-25.

the further condition that the universe of bidders will be restricted to current creditors or interest holders of the Debtor[31] demonstrates both the lack of any such marketing, and the lack of any legitimate market to test the market value of the equity interest.

The Plan is not fair and equitable as to secured or unsecured creditors. The Plan fails to meet the requirements of the new value corollary to the absolute priority rule. In addition, the Plan attempts improperly to discriminate against unsecured creditors by preferring the alleged unsecured claims of the Debtor's tenants.[32]

### F. Reservation of Further Objections.

US Bank reserves its right to present further, or modified objections to the Plan based upon arguments of the Debtor and evidence that may be obtained through discovery or presented at trial.

## III. CONCLUSION

The Plan violates numerous subsections of § 1129(a) in addition to (a)(8), and so may not be confirmed. Even if the Plan did satisfy all of the requirements of § 1129(a) other than (a)(8), it does not meet the requirements of § 1129(b), and so may not be confirmed. US Bank respectfully requests the Court to enter an order denying confirmation of the Plan, together with such other and further relief as the Court may deem just and proper.

Dated: November 30, 2010.     **PERKINS COIE BROWN & BAIN PA**

By: */s/ Richard M. Lorenzen  (006787)*
    Richard M. Lorenzen
    2901 North Central Ave., Suite 2000
    Phoenix, Arizona  85012

Attorneys for U.S. Bank, N.A., as Trustee for the Registered Holders of Merrill Lynch Mortgage Trust 2006-C1, Commercial Mortgage Pass-Through Certificates, Series 2006-C1

---

[31] Disclosure Statement, 19:20-22.
[32] As set forth above, the claims of the tenants are not actually general, unsecured claims. Rather, they are administrative priority claims that are not entitled to vote.

ORIGINAL electronically filed and
COPY served via E-mail and First Class Mail
on November 30, 2010, to:

**UNITED STATES TRUSTEE**
230 N. First Avenue, Suite 204
Phoenix, AZ 85003

Philip R. Rudd
**POLSINELLI SHUGHART PC**
One East Washington, Suite 1200
Phoenix, AZ 85003
prudd@polsinelli.com
Counsel for Debtor

/s/ *Kathryn Hardy*
60642-0165/LEGAL19664373.1